**RTC MORTGAGE TRUST 1994 N–1, a limited liability Delaware business trust, Plaintiff,**

v.

**FIDELITY NATIONAL TITLE INSURANCE COMPANY, Nations Title Insurance Of New York, Eastern Developers Abstract, Inc., Caine, Dipasqua, Sloane & Raffaele f/k/a Caine, DiPasqua, Sloane, Raffaele & Nigro, Lawyers Title Insurance Corporation, and Rocco M. Nigro, Defendants.**

No. CIV.A. 96–5874.

United States District Court, D. New Jersey.

July 29, 1999.

John P. O'Toole, Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P., Newark, NJ, for Defendant, Caine, DiPasqua, Sloane & Raffaele.

Charles J. Vinicombe, Drinker, Biddle & Reath, L.L.P., Princeton, NJ, for Defendant, Lawyers Title Insurance Corp.

Josiah A. Knapp, Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano, P.C., Cherry Hill, NJ, for Defendants, Fidelity National Title Insurance Company and Nations Title Insurance of New York.

Rocco M. Nigro, Media, PA, pro se.

John A. Adler, Hellring, Lindeman, Goldstein & Siegal, L.L.P., Newark, NJ, for Plaintiff, RTC Mortgage Trust 1994 N–1.

OPINION

ORLOFSKY, District Judge.

I. INTRODUCTION .................................................. 507
II. BACKGROUND .................................................... 509
III. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT ......................................................... 519
IV. DISCUSSION .................................................... 520
 A. *RTC Mortgage Trust's Motion for Partial Summary Judgment Against Nigro and Caine, DiPasqua* ..................................... 520
 1. *An Attorney's Duty to a Non–Client* .............................. 521
 2. *Breach of Duty of Care Owed by Nigro to Home Federal* ........... 522
 3. *Proximate Cause and Injury* ..................................... 526
 4. *Respondeat Superior Liability* .................................. 529
 B. *FNTIC's and NTI's Motion for Summary Judgment* .................. 530
 1. *FNTIC Is Not Title USA's Successor* ............................. 530
 2. *NTI's Motion for Summary Judgment* ............................. 530
 a. *RTC Mortgage Trust's Claim Against NTI for Breach of the Title Insurance Policy* ....................................... 530
 1) *Legal Standard Governing Construction of Title Insurance Policies* ......................................... 531
 2) *Title USA Did Not Breach the Title Insurance Policy* ........ 532
 b. *RTC Mortgage Trust's Claim for Negligent Title Search Against NTI* ..................................................... 535
 c. *RTC Mortgage Trust's Claim for Negligent Hiring* .............. 542
 d. *Statute of Limitations* ....................................... 542
 e. *NTI's Request that this Court "Re-examine" its Holding in RTC Mortgage Trust II* ..................................... 545
 f. *Counsel Fees* ................................................ 547
 C. *LTIC's Motion for Summary Judgment* ............................ 548
V. CONCLUSION .................................................... 549

## I. INTRODUCTION

This case involves a failed savings and loan's claims for breach of contract, negligence and legal malpractice, arising out of a commercial real estate transaction in which defendant, Rocco M. Nigro, Esq., acted as counsel for the buyer and the seller of the property, rendered an opinion letter for the benefit of the mortgage company, owned the title agency which negotiated the title insurance coverage and acted as the closing agent on behalf of the un-

derwriting title insurance company. In sorting out the conflicting duties of care owed by Mr. Nigro, as well as his law firm and the title insurance companies involved in the mortgage transaction, I must determine the scope of an attorney's duty to a non-client third party and whether the title insurance company voluntarily assumed a duty of care to its insured, independent of its obligations set forth in the title insurance policy.

On June 16, 1997, Plaintiff, RTC Mortgage Trust 1994 N–1, successor in interest to Home Federal Savings and Loan Association, filed a five count amended complaint in this Court alleging claims for breach of contract, negligent title search, negligent hiring, and legal malpractice against Defendants, Fidelity National Title Insurance Company, Nations Title Insurance of New York, Eastern Developers Abstract, Inc., Caine, DiPasqua, Sloane & Raffaele f/k/a Caine, DiPasqua, Sloane, Raffaele & Nigro, Lawyers Title Insurance Corporation, and Rocco M. Nigro, Esq. On December 14, 1998, RTC Mortgage Trust filed a motion for partial summary judgment on the issue of liability on its claims for legal malpractice against Nigro and Caine, DiPasqua, and its claims for breach of contract and negligent title search against NTI. On December 14, 1998, NTI cross-moved for summary judgment on all claims asserted against it by RTC Mortgage Trust. In addition, on December 14, 1998, Lawyers Title Insurance Company also moved for summary judgment on all claims asserted against it by Plaintiff. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, based upon complete diversity of citizenship between the parties and the requisite amount in controversy.

For the reasons set forth below, I shall grant Plaintiff's motion for partial sum-

mary judgment on the issue of liability on its claim for legal malpractice against the Defendants, Rocco M. Nigro, Esq., and Caine, DiPasqua, Sloane & Raffaele. I shall also grant Plaintiff's motion for partial summary judgment on the issue of liability on its claim for negligent title search against Nations Title Insurance of New York. The entry of these partial summary judgments in favor of Plaintiff is subject to a resolution of disputed issues of material fact by a jury,[1] pursuant to *Lopez v. Swyer*, 62 N.J. 267, 300 A.2d 563 (1973); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566 (3d Cir.1976), to determine whether these claims, as well as Plaintiff's claim for negligent hiring, are barred by the statute of limitations.

I shall grant the motion of Defendant, Nations Title Insurance of New York, for summary judgment on Plaintiff's claims for breach of contract and the recovery of attorneys' fees. I shall, however, deny the motion of Nations Title Insurance of New York for summary judgment insofar as it seeks summary judgment on Plaintiff's claim for negligent hiring, subject to the resolution of disputed issues of material fact by a jury surrounding the statute of limitations defense. Furthermore, I shall grant Defendant, Fidelity National Title Insurance Company's motion for summary judgment on all claims asserted against it by Plaintiff. Finally, I shall grant the motion of Defendant, Lawyers Title Insurance Company, for summary judgment on all claims asserted against it by Plaintiff.

In addition, given the multiple representations undertaken by Mr. Nigro in this transaction, and the myriad conflicts of interest presented by his conduct, I conclude that Rocco M. Nigro, Esq., violated Rule 1.7 of the New Jersey Rules of Professional Conduct, made applicable in this

---

1. Although this is a diversity case, in this Circuit, the "discovery rule" hearings conducted pursuant to *Lopez v. Swyer* to ascertain when a cause of action "accrues," for purposes of determining when the statute of limitations begins to run, is decided by a jury, rather than the Court. *See Goodman v. Mead Johnson & Co.*, 534 F.2d at 571–73. In New Jersey state court, such determinations are made by the Court, sitting without a jury. *Lopez*, 62 N.J. at 274, 300 A.2d 563.

Court pursuant to Rule 103.1(a) of the Local Civil Rules of this Court.[2] Accordingly, I shall refer this matter to David E. Johnson, Jr., Esq., Director of the New Jersey Office of Attorney Ethics, for whatever action he deems appropriate.

## II. BACKGROUND

The facts and procedural history of this case have been summarized to some extent in this Court's Opinions of October 20, 1997, *RTC Mortgage Trust 1994 N–1 v. Fidelity National Title Insurance Co., et al.*, 981 F.Supp. 334 (D.N.J.1997) ("*RTC I*"), and August 14, 1998, *RTC Mortgage Trust 1994 N–1 v. Fidelity National Title Insurance Co., et al.*, 16 F.Supp.2d 557 (D.N.J.1998) ("*RTC II*"). What follows below are the facts and procedural history relevant to Plaintiff's and Defendants' respective motions and cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

On June 16, 1997, Plaintiff, RTC Mortgage Trust 1994 N–1 ("RTC Mortgage Trust"), filed a five count Amended Complaint[3] in this Court alleging claims for negligence and breach of contract against Defendants, Fidelity National Title Insurance Company ("FNTIC"), Nations Title Insurance of New York ("NTI"),[4] Eastern Developers Abstract, Inc. ("Eastern"), Caine, DiPasqua, Sloane & Raffaele f/k/a Caine, DiPasqua, Sloane, Raffaele & Nigro ("Caine, DiPasqua"), Lawyers Title Insurance Corporation ("LTIC"), and Rocco M. Nigro, Esq. ("Nigro"). *See* Amended Complaint (filed June 16, 1997). RTC Mortgage Trust's claims include: (1) breach of a title insurance policy, negligent title search and negligent hiring against FNTIC and NTI, Count I; (2) breach of a title reinsurance policy and negligent title search against LTIC, Count II; (3) negligent title search against Eastern, Count III;[5] and (4) legal malpractice against Nigro and Caine, DiPasqua, Counts IV and V. *See* Amended Compl., Counts I–V.

Notwithstanding the convoluted procedural history of this matter and the forest of paper it has generated, *see RTC I*, 981 F.Supp. at 336–37; *RTC II*, 16 F.Supp.2d at 559–60, this case involves a relatively common commercial real estate transaction, which went sour after the borrowers/mortgagors defaulted.

2. Rule 1.7 provides, in relevant part:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after a full disclosure of the circumstances and consultation with the client, except that a public entity cannot consent to any such representation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

*See* N.J. R. Prof. Con. 1.7(b). Rule 103.1 of the Local Civil Rules of this Court provides:
The Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court, subject to such modifications as may be required or permitted by Federal statute, regulation, court rule or decision of law.

*See* L. Civ. R. 103.1.

3. The original complaint was filed on November 4, 1996, in the Superior Court of New Jersey, Law Division, Burlington County. *See RTC I*, 981 F.Supp. at 337. On December 17, 1996, Defendants removed the matter to this Court, pursuant to 28 U.S.C. § 1441, alleging federal subject matter jurisdiction on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332. *See id.* at 337–38; *see also* Notice of Removal (filed Dec. 14, 1997).

4. Plaintiff improperly pleaded Nations Title Insurance of New York as Nations Title Insurance Company. Having noted the error, I shall correct the caption to reflect NTI's proper name.

5. Rocco Nigro, the sole shareholder, director, and president of Eastern, dissolved the corporation in 1993, after Eastern declared bankruptcy. *See* Certification of Robert A. Berns, Esq. (filed Dec. 14, 1998), Exh. B (Deposition of Rocco M. Nigro (dated Mar. 3, 1998) at 15). Consequently, Eastern has not answered or otherwise defended in this matter.

George Diemer ("Diemer") and Robert Pacilli ("Pacilli") were commercial real estate developers and the general and limited partners in Mount Laurel Associates ("MLA"), a Pennsylvania limited partnership. *See* Plaintiff's Rule 56.1 Statement of Undisputed Fact (filed Dec. 14, 1998), ¶ 6, 8 (hereinafter "Pl. R. 56.1 (Cts.IV–V)"). "Starting in or about 1985, ... Nigro[, an attorney of the bars of New Jersey, Pennsylvania, and Florida, *see* Letter to the Court from Rocco M. Nigro (dated Jan. 7, 1999),] ... was the principal attorney for Diemer, Pacilli and MLA with regard to the acquisition, financing and sale of land in Mount Laurel Township, Burlington County, consisting of approximately 350 acres, which came to be known as the Horizon Corporate Center." *See* Pl. R. 56.1 (Cts.IV–V); *see also* Certification of Robert A. Berns, Esq. (filed Dec. 14, 1998), Exh. B (Deposition of Rocco M. Nigro, Esq. (dated March 9, 1998) at 39–42). On one of the parcels of land within the Horizon Corporate Center, a 6.94 acre parcel, Lot 1, Block 1300.02 on the Tax Map of Mount Laurel Township, Burlington County, also known as Parcel 2 (the "Property"), was constructed an office building called Atrium II. *See* Pl. R. 56.1 (Cts.IV–V), ¶ 7; *see also* Certification of John A. Adler, Esq., in Support of Partial Summary Judgment against Nigro and Caine, DiPasqua (filed Dec. 14, 1998), Exh. K (Deed to the Property (dated Aug. 29, 1988)), and Exh. O (Mortgage Covering the Property (dated Aug. 29, 1988)). The Property and the mortgages covering the Property form the subject-matter of this litigation. *See RTC II*, 16 F.Supp.2d at 559.

"Prior to August of 1988, Nigro, acting as attorney for Diemer and Pacilli and as title agent through Eastern[, in which Nigro was the sole shareholder,] participated in numerous transactions ... regard[ing] ... the Horizon Corporate Center, including transactions involving [the Property]."

See Pl. R. 56.1 (Cts.IV–V), ¶ 9 (citing Nigro Dep. at 40–42, 47, 50). "Many of th[e] transactions involved Fidelity Bank, N.A. ('Fidelity') ... which provided construction and other financing for Diemer and Pacilli with regard to properties owned by them ... in the Horizon Corporate Center[,]" including the Property. *Id.*

Two such transactions are of particular relevance to this case. First, on March 7, 1986, Nigro, as title agent for Eastern and as counsel for MLA, participated in a real estate closing of a commercial loan for $11,800,000 from Fidelity to MLA for the purpose of refinancing MLA's previous indebtedness and to finance the construction of an office building in the Horizon Corporate Center ("the construction loan"). *See* Nigro Dep. at 50–51. "As security for the construction loan, Fidelity obtained a first mortgage on [the Property] in the amount of $11,800,000." *See* P.R. 56.1 (Cts.IV–V), ¶ 10.

Second, on June 13, 1986, Nigro, again acting as title agent and counsel for MLA, participated in a real estate closing in which Fidelity loaned MLA $9,700,000 to purchase a parcel of raw land located within the Horizon Corporate Center. *See id.*, ¶ 11; *see also* Nigro Dep. at 53–55. As security for this loan, Fidelity obtained a first mortgage on the raw land and a second mortgage on the Property ("the second mortgage"). *See* Nigro Dep. at 53–54. Nigro recorded the second mortgage on behalf of MLA and Fidelity.[6] *See id.*

Subsequently, Diemer and Pacilli organized another limited partnership, called Atrium II Limited Partnership ("Atrium II"), to seek additional financing from lenders other than Fidelity. *See* Adler Cert., Exh. H (Loan Commitment Letter (dated June 8, 1988)). On June 8, 1988, Nationwide Capital, a wholly owned subsidiary of Home Federal Savings and Loan ("Home Federal"), extended a mortgage

---

**6.** On April 29, 1988, Eastern recorded a third document entitled "Amendment to Loan Documents" which also covered the Property.

*See* Pl. R. 56.1 (Cts.IV–V), ¶ 12; *see also* Adler Cert., Exh. E (Amendment of Loan Documents, dated Apr. 29, 1988).

loan commitment to Diemer, on behalf of Atrium II, in the amount of $13,500,000. *See id.* As security for the loan, Home Federal sought a first lien priority on the Property. *See id.* In addition, the loan commitment letter stated the terms and conditions under which Home Federal would proceed with the transaction. *See id.*

In particular, the loan commitment letter set forth Home Federal's title insurance requirements. *See* Adler Cert., Exh. H. Specifically, the letter provided:

(1) Title insurance requirements—A title commitment from a title insurer and title agent approved by title insurer, acceptable to Home Federal, in form as follows:

(a) The insured amount must be the full loan amount plus maximum deferred interest. . . .

. . .

(d) The standard exceptions indicated on the commitment must be deleted from the final title policy. Home Federal must be provided with the recorded copies of all title exceptions and other instruments referenced in the title commitment.

. . .

(f) If you are using a title agent, an insured closing letter. . . .

*Id.*

The loan commitment letter further required "[a] letter from an attorney licensed to practice law in New Jersey, retained by the borrower and acceptable to Home Federal, opining as to those matters set forth in the form of opinion letter attached." *Id.* The attached form opinion letter sought a legal opinion that "[Atrium II] owns good and marketable fee simple title to [the Property] . . . [and that the mortgage] constitutes a first lien security interest valid against all third parties, subject only to the matters and exceptions referred to in [the] Title Commitment. . . ." *Id.*

As counsel for Diemer, Nigro was retained to represent Diemer, Pacilli, MLA

and Atrium II in the Home Federal mortgage transaction. *See* Nigro Dep. at 75, 107–108. Thus, under the terms of the loan commitment letter, Nigro, as Atrium II's counsel, was required to prepare an opinion letter on the first lien priority position of the Home Federal mortgage. *See* Adler Cert., Exh. H, and Exh. Q (Letter to Nigro from Nationwide Capital (dated June 23, 1988)).

With regard to title services, Nigro's practice was to refer his real estate clients, like Diemer and Atrium II, to Eastern, in which Nigro was the president, sole director, and sole shareholder. *See* Nigro Dep. at 11–14. Eastern would then act as the title agent for Nigro's real estate closings with Title USA Corporation of New York ("Title USA"), predecessor in interest to NTI, *see* NTI's Rule 56.1 Statement of Undisputed Facts (filed Dec. 14, 1998), ¶ 1 (hereinafter "NTI R. 56.1"), serving as the underwriting title insurance company. *See* Adler Cert., Exh P (Loan Agreement, ¶ 1.31); *see also* Nigro Dep. at 13–15. This same practice was followed by Nigro in connection with the Home Federal mortgage closing: Nigro served as counsel for Atrium II and, through Eastern, as the title agent, with Title USA underwriting the title insurance policy. *See* Adler Cert., Exhs. H, P, Q.

Eastern had a total of three employees, namely, Nigro, its president; Linda Winfree, its secretary and treasurer; and Jane Ervin, who is listed as the "manager" on Eastern's letterhead. *See* Nigro Dep. at 78–79; *see also* Adler Cert., Exh. X (Letter from Eastern to Title USA (dated July 8, 1998)). Ms. Winfree was also employed as Nigro's legal secretary and paralegal. *See* Nigro Dep. at 18–19.

Under the terms of the loan commitment letter, the loan agreement, and Eastern's agency agreement with Title USA, Eastern was responsible for searching the Property's title and preparing the Title Commitment. *See* Nigro Dep. at 13–17; Adler Cert., Exhs. H, P; *see also* Certifi-

cation of Josiah A. Knapp, Esq. (filed Dec. 14, 1998), Exh. C (Agency Agreement between Eastern and Title USA). On the issue of Eastern's operations, Nigro testified:

Q. [By Mr. Adler] At the time we're talking about, which is August of 1988, [where was Eastern physically located?] . . .

A. [By Nigro] . . . I had a law office, and Linda Winfree who worked for me had another office where the title company was—our files were there and our equipment was there, and we did our [title] work out of there . . . .

Q. Did Eastern have a separate office with its own rooms at Caine[,] DiPasqua?

A. Yes, that one room . . . . [Eastern] was a title agency not in the true sense of the word. It didn't do title for a number of people and do a lot of transactions. It was relatively limited to my clients that I had, and the legal business I did some title work for them.

. . .

Q. Tell me how the actual searches were done; who did them and what was the procedure?

A. . . . On a typical [New Jersey] property I would be informed that we're going to write a policy for a given transaction. I would usually contact . . . Jane Ervin . . . . I would tell her that I needed to do a transaction, and she would order what we call a search commitment. She would order it from some independent contractor in the county where we were going to insure the property.

. . .

She would contact—I presume she would. She told me she would. She would contact, did search work and did commitment work. She would get all of the information needed to formulate and prepare a [title] commitment and then prepare one.

Q. She would prepare a commitment?

A. Yes.

Q. And then what?

A. Then it would come to me and I would take a look at it and decide who we had to contact, what we had to do to clear up some of the items on the commitment such as judgments, liens or whatever.

*See* Nigro Dep. at 13–17.

Regarding the title search and commitment prepared in the Home Federal mortgage transaction, Nigro testified:

Q. [By Mr. Adler] . . . Now who prepared the commitment?

A. [By Nigro] In all probability, it was prepared by Jane Ervin because[ ][t]hat [sic] who was preparing commitments at the time, and also on the commitment itself it has as part of the number, EJ, so that means Ervin, Jane. So I presume that has something to do with it. I have no specific independent recollection.

Q. What role did you play in the preparation of this Commitment No. EJ 123?

A. Probably minimal in preparing it, but I probably reviewed it and met with Linda Winfree who apparently was writing back and forth to [Home Federal] and [I] probably approved the things that she was doing.

. . .

Q. Now, on schedule B [of the Title Commitment], there is a number starting with number nine. In reference to certain documents of record, where did that information come from?

A. . . . Typically, it would come from either the search that we did for that transaction or other things that we had on file. In Mount Laurel, unlike most transactions, we had insured numerous properties in Mount Laurel, the Mount Laurel Park [i.e., Horizon Corporate Center,] and we had insured numerous pieces numerous times.

So a lot of times we didn't go in and do a full blown search every time we did something. We relied on our prior ma-

terials, *and I would decide whether we needed a further search, supplemental search or whatever we may have needed in that particular transaction.*

At the time if you did a search on a Mount Laurel property, [like the Property at issue,] it would probably cost a couple thousand dollars to take numerous months to get done because it was so voluminous. *As a matter of practicality and expedience, we had to somehow shorten that process to the best we could.*

Q. I take it that in preparation of this commitment, a full search of the record was not made?

A. I'm not certain. It may or may not have been.... [Regarding the Property,] I'm not sure what was done, but we had insured Atrium II. When we acquired it, constructed the building, we added the amendment to the construction loan when we did the land loan. We had numerous files on this [Property]. We would do this kind of case and look at what we have and look at our policies and our commitments, all of those things, and construct what we believe is a commitment, what you believe you would find on record if you went to the courthouse....

. . .

Q. Would the records of Eastern ... have included [Fidelity's] second mortgage [on the Property] that had been recorded in 1986?

A. They should have. I don't know if they did or not, but they should have because we had insured that second mortgage and we did the transaction which [meant] we had a file on it. We did have one location with all of the Mount Laurel documents, the copies of them. It was at Jane's house. She told me it used to consume yards of file space. So we did have everything. Whether or not [a file on Fidelity's second mortgage] was actually there, I can't tell you. I know we had every-

thing that we had done to that date, at least a copy of it.

Q. Does the second mortgage appear [on] this commitment?

A. No.

Q. Can you tell me why?

A. I don't know why.

Q. But should it have?

A. If it was on record at the time, yes, it should have; and if we were going to remove it, it would have been removed.... If it were on record, it should have been there[.]

*See* Nigro Dep. at 78–83.

In addition, in a previous deposition in 1992, during an adversary proceeding in the Bankruptcy Court, *see RTC II,* 16 F.Supp.2d at 559, Nigro testified:

Q. Because Fidelity's second mortgage on the Atrium II premises ... was in your files, that would have been reflected on [your title searches]?

A. It should be. Sometimes they are not.

Q. If it weren't, why wouldn't it be?

A. Human error. Assuming it should be and weren't, it's a mistake.

Q. And if such a mistake was made, whose mistake would it be?

A. Either Jane Ervin's, myself, or possibly the person who searched the records.... Somebody has to make a mistake when something doesn't appear and it should appear. But it happens. If you are doing a lot of title work, it happens now and then.... And hopefully we catch those. If we don't, that's what the insurance is for.

*See* Deposition of Rocco M. Nigro, Esq. (dated Mar. 27, 1992), at 119–20 (herinafter, "1992 Nigro Dep.").

Because the Home Federal mortgage transaction involved $13.5 million, a loan amount well in excess of Eastern's authorized level of coverage, Eastern was required to obtain approval for the transaction from its underwriter, Title USA. *See* Knapp Cert., Exh. C. On June 23, 1988,

after the title search of the Property failed to discover Fidelity's second mortgage of record, Linda Winfree sent a copy of the proposed Title Commitment to Title USA for review. *See* Adler Cert., Exh. G (Cover Letter from Eastern to Title USA (dated June. 23, 1988)). The proposed Title Commitment was reviewed by Mark S. Baillie, Esq. ("Baillie"), Assistant Vice President and National Division Counsel for Title USA. *See* Certification of John A. Adler, Esq., in Opposition to Motion for Summary Judgment of NTI (filed Dec. 14, 1998) ("Adler Cert. (NTI)"), Exh. F (Letter to Eastern from Mark S. Baillie, Esq. (dated June 27, 1988)). Baillie responded to Winfree on June 27, 1988, informing her that the proposed Title Commitment could not be approved "until such time as [Title USA was] advised in writing upon what basis each and every exception was removed from Schedule B and what, if any, affirmative coverages [were] being requested [by Home Federal]." *Id.* (emphasis omitted).

On June 23, 1988, Winfree also sent a copy of the proposed Title Commitment, referred to by the parties as the "marked-up" Title Commitment, to Nationwide Capital, which was co-ordinating the mortgage transaction for Home Federal. *See* Adler Cert., Exh. B (Cover Letter from Eastern to Nationwide Capital (dated June 23, 1988)). The "marked-up" Title Commitment listed Fidelity's construction loan, secured by the Property, but failed to disclose the existence of Fidelity's second mortgage. *See* Adler Cert., Exh. U ("Marked–Up" Title Commitment). Nationwide Capital reviewed the "marked-up" Title Commitment, making alterations to the commitment directly on the document. *See id.* Consistent with the terms of the mortgage loan commitment letter, Nationwide Capital noted on the "marked-up" Title Commitment that it still needed copies of some instruments affecting the Property's title, referenced in the "marked-up" Title Commitment. *See id.*

On August 4, 1988, Baillie, on behalf of Title USA, approved the proposed Title Commitment in the Home Federal mortgage transaction. *See* Adler Cert. (NTI), Exh. H (Letter from Baillie to Winfree (dated Aug. 4, 1988)). Baillie also informed Winfree that "[i]t [was] not good underwriting practice to mark-up a commitment or pending policy prior to closing." *Id.* Baillie further informed Winfree that "[m]ark-ups should be made at the closing pursuant to lender request...." *Id.*

Notwithstanding Baillie's directions regarding "mark-ups," on August 17, 1988, Winfree, on behalf of Eastern, sent Nationwide Capital a second "marked-up" Title Commitment, reflecting Home Federal's changes. *See* Adler Cert., Exh. V. The second "marked-up" Title Commitment did not disclose the existence of Fidelity' second mortgage on the Property. *See id.*

On August 17, 1988, Winfree also informed Nationwide Capital that LTIC had contracted with Title USA to reinsure the title policy which would be issued subsequent to the closing. *See id.* Subsequently, on August 19, 1988, LTIC sent Nationwide Capital and Eastern a letter stating:

> LTIC agrees to accept $8,825,274.00 of secondary liability behind Title USA['s] ... $2,000,000.00 of primary liability on the $13,825,274.00 Owner's Policy insuring The Atrium II Limited Partnership and a simultaneous Mortgagee Policy insuring Home Federal ... on [the Property]. We also understand Title USA ... will be taking $3,000,000.00 of secondary liability.

*See* Certification of Janice D. Walton (filed Dec. 14, 1998), Exh. 9 (Letter to Eastern and Nationwide from LTIC (dated Aug. 19, 1998)).

On June 23, 1988, in accordance with the terms of the loan commitment letter, Nationwide Capital sent Nigro, who was acting as counsel for the borrower, Atrium II, a series of documents necessary to the completion of his opinion letter. *See* Adler Cert., Exh. Q (Letter from Nationwide

Capital to Nigro (dated June 23, 1988)). The enclosed documents included the loan agreement, the mortgage and security agreement, the promissory note, the assignment of rents and leases, and the absolute guaranty of payment and performance. *See id.* The cover letter informed Nigro that if he had any questions he should contact counsel for Nationwide Capital and Home Federal, Larry Goodman, Esq. *See id.*

As the closing date for the Home Federal mortgage approached, as required by the mortgage loan commitment letter, on August 18, 1988, Title USA issued an insured closing letter to Nationwide Capital, on behalf of Home Federal. *See* Adler Cert., Exh. U. The insured closing letter provided that Title USA:

> agree[d] to reimburse [Home Federal] for actual loss incurred by [Home Federal] in connection with [the] closing[ ] when conducted by [Title USA's] Issuing Agent, ... when such loss arises out of ... [the][f]ailure of the Issuing Agent[, namely, Nigro, on behalf of Eastern,] to comply with [Home Federal's] written closing instructions to the extent that they relate to ... the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land....

*Id.* The insured closing letter also provided that any claim for actual loss by an insured must be filed "within twelve months from the date of [the] closing." *Id.*

On August 29, 1988, the date of closing, Nationwide Capital, on behalf of Home Federal, issued its written closing instructions to Eastern. *See* Adler Cert., Exh. L (Letter from Larry Goodman to Linda Winfree (dated Aug. 29, 1988)). The closing instructions letter stated, in relevant part:

> Home Federal has received Title USA's marked-up title commitment which evidences that all requirements of Schedule B [the instruments of record affecting title to the Property] have been satisfied

and that Title USA is prepared to issue an ALTA title policy in the amount of $5,000,000.00 and [LTIC] will simultaneously issue a re-insurance policy in the amount of $8,825,274.00 as first lienholder on the Property encumbered by the Mortgage ... and subject only to those exceptions [listed in Schedule B].... [Eastern, as closing agent for Title USA, shall] record the [loan documents] ... with the appropriate governmental offices, WHEN AND ONLY WHEN [the Home Federal] Mortgage constitutes, in fact, a lien of record against the Property ... and when ... Title USA can affirmatively insure Home Federal as of the date and time of recordation of the Mortgage that such Mortgage constitutes a valid first lien against the Property.... You are authorized to disburse the Proceeds in accordance with these instructions WHEN AND ONLY WHEN you are able to strictly comply with the instructions of th[is] letter....

*Id.* (emphasis in original).

On August 29, 1988, Nigro provided Home Federal with his opinion letter. *See* Adler Cert., Exh. R (Opinion Letter (dated Aug. 29, 1988)). The opinion letter, written on Caine, DiPasqua letterhead, stated, in relevant part:

> At your request we provide you with this opinion in our capacity as counsel to the Borrower and its general partner. In rendering this opinion, we have reviewed originals of the following documents:
>
> 1. The Loan Agreement executed by Borrower and Lender.
>
> 2. The Promisory [sic] Note made by Borrower to the order of the Lender in the principal amount of $13,825,274.00.
>
> 3. The Mortgage and Security Agreement executed by the Borrower to Lender.
>
> 4. The Assignment of Rents and Leases executed by Borrower.

5. Uniform Commercial Code Financing Statements executed by Borrower in favor of the Lender.

6. Title USA Insurance Corporation of New York Title Commitment bearing File No. EJ—123, including endorsements, if any, issued through the date hereof (the "Title Commitment").

The documents referred to in Paragraphs one through six above are each dated of even date herewith and collectively referred to as the "Loan Documents". [sic]

In addition, *we have examined such other record documents, certificates, instruments and materials as in our judgment are necessary and appropriate to enable us to render this opinion.* We have, however, assumed the validity of all such records, documents, certificates, instruments and materials and the genuineness of all signatures thereon. Based upon the foregoing, we are of the opinion that: ...

Borrower owns good and marketable fee simple title to the real property described in the Mortgage and Security Agreement subject to those matters noted in the Title Commitment delivered to Lender, *and the Mortgage and Security Agreement constitutes a first lien security interest valid against all third parties subject only to the matters and exceptions referred to in said Title Commitment.* Borrower's title to such real property is not subject to any vendor's lien....

To the best of our knowledge, the Borrower has made no contact or arrangement of any kind except the Construction Agreement with Pace Associates, Inc. and agreements with its architect, surveyor and engineer, the performance of which by the other party thereto would give rise to a lien on the Property....

We are members of the bar of the State of New Jersey and do not purport to be expert on, or to express any opinion herein concerning, any laws other than the laws of the State of New Jersey and the Federal laws of the United States, and this opinion is.... Our opinions are rendered as of the date hereof and are solely for the benefit of Lender in connection with the Loan.... In delivering this opinion to you, we are not undertaking to apprise you either of any transactions, events or occurrences taking place after the date of this letter of which we may acquire any knowledge or of any change in applicable laws taking place after the date of this letter which may affect any of our opinions set forth in this letter. The opinions expressed in this letter are based upon the applicable laws, regulations and ordinances in effect as of the date of this letter.

*Id.* (emphasis added).

In his March 9, 1998, deposition testimony, Nigro discussed the procedure he followed in drafting the opinion letter. *See* Nigro Dep. at 113–118. He testified:

A. [By Nigro] [T]ypically a lender would give me a proposed letter. I would look at it, and then typically they would tell me what they wanted their final draft as; and if I could live with it, I would put it on my stationery and sign it. If I couldn't live with it, I would call them and say I can't do this and that and then I would sign it.

. . .

Q. [By Mr. Adler] Did you review the [loan] documents ... itemized on the first page ... [of the opinion letter]?

A. I presume that I did, because it says that I did. I don't have any independent recollection.

. . .

Q. What was the basis for your opinion that [Home Federal] was getting a first loan through its mortgage and security agreement?

A. The basis was that I knew that Fidelity Bank was the only bank to have an interest in the property prior to settlement. I knew we were going to pay

Fidelity out and I knew that Fidelity, as in the past, would satisfy or file any discharges necessary of record. So I knew that as soon as Fidelity got that money [for the construction loan], we would have a clear title; and therefore, Home[ Federal] would be in the first position.... With those presumptions, I issued a letter saying they would be in first position.

Q. You didn't put those assumptions in the letter?

A. No. You never did.... At the settlement is where it all happens. Since we [Eastern] receive the funds, we control all of the prerequisite things that I assumed....

Q.... [D]id you consider the second mortgage which was of record?

A. I believe I did.... I knew that Fidelity Bank wanted out of this property.... [A]t the time [it] was extremely confusing as to which mortgages affected which pieces of property. There were literally hundreds of parcels and literally hundreds of documents. They were cross-referenced all over the place. It was impossible to tell which documents affected which properties and vice versa. You [had] to rely on the fact that Fidelity was going to get out of this and divest itself of it.... I presumed that [Fidelity was] going to remove all encumbrances whether on the title or not.... [Fidelity] didn't want the property. You can't say give me 11 million dollars and I'll hold a nine million dollar ... mortgage on the property. It wasn't written down, it's not in my letter, anywhere, just in good faith.

...

Q. You were giving this title opinion as a lawyer. Right?

A. That's right.... Let's assume there was an independent title company. I would look at the title and base my opinion on the title commitment as a lawyer because I have no other way of knowing. I ordered a title search. I don't go to the courthouse myself. I

presume certain mortgages are going to be paid off and I issued the opinion. *See* Nigro Dep. at 112–18.

Contrary to Nigro's assumptions, Jeffrey Reinhold, a Fidelity loan officer responsible for the Horizon Corporate Center properties, *see* Nigro Dep. at 119, testified that he did not discuss the second mortgage with Nigro or Winfree prior to the Home Federal mortgage closing, did not have the authority to discharge the second mortgage without payment in full, and did not have a "general understanding" with MLA, Atrium II, Eastern or Nigro, regarding the release of Fidelity's second mortgage. *See* Supplemental Certification of John A. Adler, Esq. (filed Dec. 14, 1998), Exh. C (Amended Answer to FNTIC's and NTI's Interrogatory No.1, Exhs. A and B (Deposition of Jeffrey Reinhold (dated Mar. 17, 1992))).

On August 29, 1988, the closing of the Home Federal mortgage "took place at the offices of Nationwide [Capital] in Roslyn, Virginia." *See* Pl. R. 56.1 (Cts.IV–V), ¶ 20. Nigro and Winfree acted as closing agents. *See id.;* Adler Cert., Exh. J (HUD–1 Closing Statement). Nigro also acted as counsel for the borrower, Atrium II.

At closing, title to the Property was transferred from MLA to Atrium II. *See* Pl. R. 56.1 (Cts.IV–V), ¶ 20. Atrium II executed and delivered to Home Federal a promissory note in the amount of $13,500,-000, an assignment of leases and rents, and a mortgage and security agreement. *See* Pl. R. 56.1 (Cts.IV–V), ¶ 21. In addition, Title USA, through Eastern, provided Home Federal with a final Title Commitment which failed to reference Fidelity's second mortgage on the Property. *See* Adler Cert., Exh. V (Final Title Commitment).

"Pursuant to a payoff letter from Fidelity, [Home Federal] paid Fidelity $10,982,-446.99 and obtained discharges of the initial Fidelity construction mortgage ... dated March 7, 1986, ... and an amend-

ment to the mortgage dated April 7, 1988 ... ." *See* Pl. R. 56.1 (Cts.IV–V), ¶ 22. The discharges were subsequently filed. *See* Adler Cert., Exh. T (Discharges).

In the months that followed the August 29, 1988, closing, Winfree sent Home Federal letters stating:

> Please be advised that we have done a bringdown [search] on the [Property], and there are no liens, encumbrances, judgments or the like listed against that property. Therefore, Home Federal is in a first lien position. . . .

*See* Adler Cert. (LTIC), Exh. K (Letters from Winfree to Home Federal (dated Nov. 14, Dec. 21, 1988, Jan. 26, Feb. 28, May 1, Jul. 7, Sept. 7, Oct. 17, Nov. 27, 1989, Jan. 11, 1990)). Although all the previous letters had been written on Eastern letterhead, the last such letter, dated January 11, 1990, contained the same text, but was sent to Home Federal on Caine, DiPasqua letterhead. *See id.*

In January, 1989, Title USA issued a title insurance policy to Home Federal with an effective date of August 30, 1988. *See id.*, Exh. W (Title USA Title Policy); *see also* Pl. R. 56.1 (Cts.IV–V), ¶ 23. On February 14, 1989, LTIC formerly "entered into a reinsurance agreement with Title USA" under the terms set forth in LTIC's August 19, 1988, letter to Eastern and Nationwide Capital. *See* Walton Cert., ¶ 2, Exh. 9.

In late 1989 and throughout 1990, MLA, Diemer and Pacilli experienced financial difficulties causing them to default on the mortgages covering the Horizon Corporate Center properties. *See* Knapp Cert., Exhs. N–R (pleadings in state court actions to foreclose other mortgages covering Horizon Corporate Center). In 1990, Atrium II faced similar financial problems. *See RTC II*, 16 F.Supp.2d at 559. "Late in 1990, Home Federal ... began foreclosure proceedings against Atrium II in New Jer-

sey state court." *RTC II*, 16 F.Supp.2d at 559. "These proceedings were stayed when Atrium II filed a petition in the United States Bankruptcy Court for the District of New Jersey." *Id.* Subsequently, "Fidelity ... filed an adversary complaint in the Bankruptcy Court claiming that it[s second mortgage] ... on the [P]roperty ... [was] superior to those held by Home Federal. . . ." *Id.*

"In March, 1993, the District Court reversed the Bankruptcy Court's determination, rendered in May, 1992, that Fidelity['s second mortgage] had priority." *RTC II*, 16 F.Supp.2d at 559. "The Third Circuit affirmed this decision in August, 1995." *Id.; see also In re Atrium II Ltd. Partnership*, 60 F.3d 816 (3d Cir.1995) (mem.); Pl. R. 56.1 (Cts.IV–V), ¶¶ 25–34 (summarizing state court and bankruptcy litigation).

"[D]uring the pendency of the bankruptcy proceedings, Home Federal ... was placed into receivership by the Resolution Trust Corporation." *RTC II*, 16 F.Supp.2d at 559 (citations omitted). As a result, Home Federal became known as HomeFed Bank, F.A. ("HomeFed"),[7] with the Resolution Trust Corporation as its conservator. *See id.* "On January 31, 1994, various assets including the Atrium II mortgage and loan were sold by the [Resolution Trust Corporation] to [Plaintiff, RTC Mortgage Trust]." *Id.* In selling these assets, the Resolution Trust Corporation assigned to RTC Mortgage Trust all of its rights, title and interests, including any causes of actions involving the assets that the Resolution Trust Corporation could have asserted arising out of the assets. *See RTC II*, 16 F.Supp.2d at 560, 562–69 (discussing the assignability of the Resolution Trust Corporation's claims to RTC Mortgage Trust).

---

7. Because the Resolution Trust Corporation's reorganization of Home Federal into HomeFed took place during the pendency of the Atrium II Bankruptcy proceedings and title priority litigation, and because the parties do not differentiate between the two entities, throughout this Opinion I shall refer to RTC Mortgage Trust's successors in interest interchangeably as "Home Federal" and/or "HomeFed."

Regarding the purchase by RTC Mortgage Trust of the HomeFed mortage, I have previously observed:

The purchase by RTC Mortgage Trust was funded in part by the issuance of bonds by RTC Mortgage Trust. The mortgages and loans purchased by RTC Mortgage Trust were collateral for the bonds and Bank of America National Trust & Savings Association ("Bank of America") acted as bond trustee. Thus, simultaneously with the execution of the Assignment from the [Resolution Trust Corporation] to RTC Mortgage Trust, the [Resolution Trust Corporation], as a matter of convenience and on behalf of RTC Mortgage Trust ..., assigned the relevant mortgages and loans to Bank of America. On January 29, 1996, following the pay-off of the bonds which partially funded RTC Mortgage Trust's purchase of the mortgages and loans ..., Bank of America and RTC Mortgage Trust assigned the collateral which had been pledged in connection with the issuance of the bonds. This was accomplished by Bank of America's assignment of all of its interest in the Atrium II mortgage and loan, among other things, to RTC Mortgage Trust. Several months later, on November 4, 1996, this litigation[, for negligence and breach of contract arising out of the Home Federal mortgage closing,] ensued.

*RTC II*, 16 F.Supp.2d at 560 (citations omitted).[8]

On December 14, 1998, RTC Mortgage Trust filed a motion for partial summary judgment on the issue of liability on its claims for legal malpractice against Nigro and Caine, DiPasqua, and its claims for breach of contract and negligent title search against NTI. *See* Pl. Notices of Motion (filed Dec. 14, 1998). On December 14, 1998, NTI cross-moved for summary judgment on all claims asserted against it by RTC Mortgage Trust. *See* NTI Notice of Cross–Motion (filed Dec. 14, 1998). On December 14, 1998, LTIC also moved for summary judgment on all claims asserted against it by Plaintiff. *See* LTIC Notice of Motion (filed Dec. 14, 1998).

## III. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

As I stated in *RTC II*, 16 F.Supp.2d at 561–62, a party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see, e.g., Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996); *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989); *Hersh v. Allen Prod. Co.,* 789 F.2d 230, 232 (3d Cir.1986).

"In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party." *RTC II*, 16 F.Supp.2d at 561; *See also, e.g., Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995); *Hancock Indus. v. Schaeffer,* 811 F.2d 225, 231 (3d Cir.1987). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).

"In deciding whether triable issues of fact exist, Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

filing of the present motions and cross-motions for summary judgment, see *RTC I*, 981 F.Supp. 334; and *RTC II*, 16 F.Supp.2d 557.

---

**8.** For a detailed discussion of the procedural history of this case, from the filing of the state court complaint on November 4, 1996, to the

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

*RTC II*, 16 F.Supp.2d at 561 (quoting Fed. R.Civ.P. 56(e)). "The rule does not increase or decrease a party's ultimate burden of proof on a claim." *RTC II*, 16 F.Supp.2d at 561. "Rather, 'the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case.'" *Id.* (quoting *Anderson*, 477 U.S. at 255–56, 106 S.Ct. 2505).

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. *See RTC II*, 16 F.Supp.2d at 561. "Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be 'supplemented ... by depositions, answers to interrogatories, or further affidavits, its opponent must do more than simply show that there is some metaphysical doubt as to material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (additional citations omitted); *see Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 ("by its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion ...; the requirement is that there be no *genuine* issue of *material* fact") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lujan v. National Wildlife Fed.*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit"); *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992) ("to raise a genuine issue of material fact ... the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather must exceed the "'mere scintilla' threshold"), *cert. denied*, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993); *RTC II*, 16 F.Supp.2d at 562.

## IV. DISCUSSION

### A. *RTC Mortgage Trust's Motion for Partial Summary Judgment Against Nigro and Caine, DiPasqua*

RTC Mortgage Trust contends that it is entitled to partial summary judgment on the issue of liability on its claim for legal malpractice against Nigro and Caine, DiPasqua (hereinafter, the "Lawyer Defendants"). *See* Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment Against Defendants Caine, DiPasqua and Nigro (filed Dec. 14, 1998) at 9–19 ("Pl. Brief (Lawyer Defs.)"). Specifically, RTC Mortgage Trust contends that "Nigro owed a duty of care to Home[ Federal], to whom he was issuing his opinion letter, to take all reasonable steps to insure that his opinion was accurate." *See id.* at 9. In addition, RTC Mortgage Trust contends that "[b]ased on principles of respondeat superior[,] ... Caine[,] DiPasqua is responsible for the

negligence of [Nigro]." *Id.* at 23 (citations omitted).

In opposing RTC Mortgage Trust's motion for partial summary judgment, the Lawyer Defendants contend that the Court must draw a distinction between Nigro's duty as an opining attorney and his role as a title agent and principal for Eastern. *See* Defendant Caine, DiPasqua's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (filed Dec. 14, 1998) at 7 ("Lawyer Defs. Brief"); *see also* Nigro Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment (filed Jan. 11, 1999) at 1 ("Nigro Brief").[9] The Lawyer Defendants contend that, "in preparation of the August 29, 1988 opinion letter, [ ] Nigro was acting in his role and capacity as an attorney[; and as] such, [he] was not charged with the responsibility personally to search the title, nor was he obligated to investigate the accuracy of the title search[,]" even though his company, Eastern, conducted the search.[10] *See* Lawyer Defs. Brief at 7.

### 1. *An Attorney's Duty to a Non–Client*

■ Under New Jersey law, a claim for legal malpractice has three elements, namely: "(1) the existence of an attorney-client relationship creating a duty of care upon the attorney; (2) the breach of such duty; and (3) proximate causation." *DeAngelis v. Rose,* 320 N.J.Super. 263, 274, 727 A.2d 61 (App.Div.1999) (King, P.J.A.D.) (citations omitted). "The abscence of an attorney-client relationship or fiduciary relationship is not necessarily al-

ways a basis to deny a legal malpractice claim asserted against an attorney by a non-client." *Id.* The determination of whether an attorney owes a duty to a non-client is, like the determination of any duty, "a question of law ... for the court." *Id.* (citing *Petrillo v. Bachenberg,* 139 N.J. 472, 479(199), 655 A.2d 1354) (additional citations omitted).

■ In New Jersey, *Petrillo v. Bachenberg,* is the "leading authority on the subject" of an attorney's duty to a non-client. *DeAngelis,* 320 N.J.Super. at 276, 727 A.2d 61; *see also Petrillo,* 139 N.J. at 472, 655 A.2d 1354. "The [New Jersey] Supreme Court stated [in *Petrillo* ] that whether an attorney owes a duty to a non-client third party depends on balancing the attorney's duty to represent clients vigorously with the duty not to provide misleading information on which third parties forseeably will rely." *DeAngelis,* 320 N.J.Super. at 276, 727 A.2d 61 (citing *Petrillo,* 139 N.J. at 479, 655 A.2d 1354.) The New Jersey Supreme Court defined the scope of a lawyer's duty to non-clients as follows:

> [A]ttorneys may owe a duty of care to non-clients when the attorneys know, or should know, that non-clients will rely on the attorney's representations and the non-clients are not too remote from the attorneys to be entitled to protection ... [A] lawyer's duty may run to third parties who forseeably rely on the lawyer's opinion or other legal services.

*Petrillo,* 139 N.J. at 483–84, 485, 655 A.2d 1354.

---

**9.** In his brief Nigro states that he "incorporates the entirety of the Memorandum of Law submitted ... by Defendant, Caine, DiPasqua ... in opposition to Plaintiff's Motion for Partial Summary Judgment, as if the Memorandum of Law had been more fully set froth herein...." *See* Nigro Brief at 1. Accordingly, the Court's citation to the brief of Caine, DiPasqua shall necessarily imply citation to the same contentions of Nigro, unless otherwise noted.

**10.** Nigro, the sole shareholder, sole director, and president of Eastern conveniently con-

tends that any negligence resulting from the search of record title was on the part of Eastern, and not in preparing his opinion letter. *See* Nigro Brief at 1–2. Because it is unnecessary to the resolution of this motion for summary judgment, I shall not engage in a piercing the corporate veil analysis, which is generally appropriate when the corporate entity is in fact the alter-ego of its controlling interest holder. *See Walensky v. Jonathan Royce International, Inc.,* 264 N.J.Super. 276, 282–83, 624 A.2d 613 (App.Div.1993).

In determining whether an attorney owes a non-client a duty of care, "the primary concern is to 'cabin' the duty of the lawyer so the resulting obligation is fair to both lawyers and the public." *DeAngelis,* 320 N.J.Super. at 276, 727 A.2d 61 (citing *Petrillo,* 139 N.J. at 484, 655 A.2d 1354). "The objective purpose of documents such as opinion letters, title reports, or offering statements, and the extent to which others forseeably may rely on them determines the scope of a lawyer's duty in preparing such documents." *Petrillo,* 139 N.J. at 485, 655 A.2d 1354 (citation omitted).

Applying the *Petrillo* standard to the facts of this case, I conclude that it is clear that Nigro had a duty to provide Home Federal with an accurate statement of its mortgage lien position. As one of its conditions to extending the $13.5 million mortgage, Home Federal required Diemer, as general partner for MLA and Atrium II, to provide a "letter from an attorney licensed to practice law in New Jersey, retained by the borrower and acceptable to Home Federal," opining as to Home Federal's first lien priority position. *See* Adler Cert., Exh. H.

In addition, the form opinion letter, provided by Home Federal to Nigro, demonstrates that Home Federal intended to rely on the representations made by Nigro in his August 29, 1988, opinion letter. *See id.; see also Petrillo,* 139 N.J. at 485–86, 655 A.2d 1354 (stating that the "roles and relationships of the parties color [the Court's] assessment" of the attorney's duty, and that opinion letters, by definition, invite a recipient's reliance). Both the form opinion letter and Nigro's opinion letter of August 29, 1988, state: "Our opinions are rendered as of the date hereof and are solely for the benefit of [Home Federal] in connection with the Loan and may not be quoted, relied on or used for any other purpose by any other person or entity." *See id.; see also* Adler Cert., Exh. R. Thus, as counsel for Diemer, MLA and Atrium II, Nigro knew that Home Federal, a clearly foreseeable non-client third

party, would rely on the representations contained in the opinion letter. *See Petrillo,* 139 N.J. at 483–84, 655 A.2d 1354. Accordingly, I conclude as a matter of law that Nigro owed a duty of care to Home Federal to provide an opinion letter accurately stating the lien priority position of the Home Federal mortgage.

Having defined the scope of Nigro's duty, it is necessary to point out that Nigro's duty "hardly constitutes lawyers as guarantors of the accuracy of [abstracts,] surveys or other similar experts' reports that they merely transmit" to a third party. *See Petrillo,* 139 N.J. at 489, 655 A.2d 1354. Nigro's duty was independent of any obligation by Eastern to search title for the benefit of Home Federal. It is undisputed that Home Federal did not contract with Eastern to provide an abstract of title, and Nigro was not asked to opine as to the accuracy of Eastern's title search. Rather, Home Federal specifically requested that Nigro review the loan documents, the Title Commitment and "other record documents[,]" and opine as to Home Federal's lien priority. *See* Adler Cert., Exh. R. In agreeing to provide Home Federal with such an opinion, Nigro assumed the duty of care of care described above.

### 2. Breach of Duty of Care Owed by Nigro to Home Federal

Having determined that Nigro owed a duty of care to Home Federal, I must next consider whether Nigro's failure to discover or disclose Fidelity's second mortgage, which was properly recorded, constituted a breach of that duty. In *Petrillo,* the New Jersey Supreme Court held that "[i]n many situations, lawyers, like people generally, may not have a duty to act, but when they act, like other people, they should act carefully." *Petrillo,* 139 N.J. at 489, 655 A.2d 1354.

In the opinion letter, Nigro, on behalf of Caine, DiPasqua, stated that they had "reviewed the originals of the following documents: 1. The Loan Agreement exe-

cuted by Borrower and Lender[;] 2. The Promissory Note[;] ... 3. The Mortgage and Security Agreement[;] ... 4. The Assignment of Rents and Leases[;] ... 5. Uniform Commercial Code Financing Statements[;] ... 6. *Title USA Insurance Corporation of New York Title Commitment bearing File No. EJ–123, including endorsements, if any, issued through the date[, August 29, 1988] (the "Title Commitment")."* See Adler Cert., Exh. R (emphasis added). In addition, the Lawyer Defendants stated in the opinion letter that, in addition to the loan documents provided by Home Federal, "we have examined such other record documents ... as in our judgment are necessary and appropriate to enable us to render this opinion." *Id.*

At his March 9, 1998, deposition, Nigro testified that, in preparing the opinion letter, he reviewed only the documents provided by Home Federal, including the Title Commitment. *See* Nigro Dep. at 112–18. He admitted that he did not review any additional documents of record. *See id.* He further testified that, although he did not disclose it in the opinion letter, he considered Fidelity's second mortgage when preparing the opinion letter. *See id.* On this issue, Nigro testified that it was unnecessary to disclose to Home Federal the existence of Fidelity's previously recorded $9.7 million mortgage covering the Property because he assumed Fidelity would discharge its second mortgage as a matter of course, even without repayment. *See id.*

In addition, Nigro testified that, because of the complicated and convoluted title history of the Property, he had to rely on his assumptions and the Title Commitment. *See* Nigro Dep. at 112–18. He testified:

> [The record] was extremely confusing as to which mortgages affected which pieces of property [in the Horizon Corporate Center]. There were literally hundreds of parcels and literally hundreds of documents. They were cross-referenced all over the place. It was impossible to tell which documents affected which properties and vice versa.

*Id.* at 116. Contrary to Nigro's belief, the complicated state of the Property's title underscored the need for him to take greater precautions in researching the state of title in order to opine that Home Federal had a first lien priority position.

First, Nigro's contention that it was "impossible" to tell which documents of record affected the Property's title is specious. Nigro testified that neither he nor anyone at Eastern conducted a title search of the Property in connection with the Home Federal mortgage transaction. *See* Nigro Dep. at 78–83. In addition, when counsel for Home Federal requested a search of the Property's title from MSM Title Agency, Inc., in connection with Home Federal's foreclosure action, Fidelity's second mortgage was identified as encumbering the Property. *See* Adler Cert., Exh. F (Title Report of MSM Title Agency, Inc. (dated Feb. 25, 1991)).

Moreover, if the Court were to accept Nigro's argument, the legal principle which would be established would be that as the degree of complexity in a commercial real estate transaction increases, the attorney's corresponding duty of care to the recipient of an opinion letter decreases. The mere statement of such a proposition is its own refutation. Furthermore, if Nigro were concerned that the state of the Property's title could not be accurately reflected in his opinion letter because of the volume of documents of record, Nigro could have included a disclaimer in his opinion letter saying as much. In the opinion letter, however, Nigro made no such disclaimer or reservation. *See Petrillo,* 139 N.J. at 486, 655 A.2d 1354 (stating that attorney did not "even hint that the [document he prepared for the benefit of third party was] anything but complete and accurate").

[6] Second, Nigro's admittedly conscious decision not to disclose to Home Federal the existence of Fidelity's second mortgage is patently unreasonable, and a clear breach of his duty of care to Home Federal. *See* Nigro Dep. at 115–18. Re-

gardless of whether Nigro and Fidelity had a prior course of dealing, where Fidelity "would satisfy or file any discharges necessary of record[,]" *see id.,* Nigro had a duty to disclose the existence of the second mortgage to Home Federal. *See* § III.A.1 *supra.* The Lawyer Defendants knew that Home Federal was relying on the opinion letter in determining whether to extend a $13.5 million loan to Atrium II. It cannot be reasonably disputed that Home Federal would have considered a previously recorded mortgage covering the Property, securing Fidelity's loan of $9.7 million, to be material to its decision to extend a $13.5 million dollar commercial loan to a borrower.

In opposing RTC Mortgage Trust's motion for partial summary judgment, the Lawyer Defendants contend that the law of New Jersey requires the presentation of expert testimony "to establish[ ] the appropriate standard of care and the substance of the breach...." *See* Lawyer Defs. Brief at 13 (citing *Spaulding v. Hussain,* 229 N.J.Super. 430, 443, 551 A.2d 1022 (App.Div.1988)). In support of this contention, the Lawyer Defendants point to the conflicting expert reports of the parties, opining that it was or was not acceptable for Nigro to rely exclusively on the Title Commitment in preparing his opinion letter. *See* Lawyer Defs. Brief at 15; *compare* Adler Cert., Exh. B (Lawyer Defendants' Expert Report of Edward J. Trawinski, Esq. (dated Oct. 23, 1998)), *with* Berns Cert., Exh. G (Plaintiff's Expert Report of S. David Brandt, Esq. (dated July 2, 1988)).

In addition, the Lawyer Defendants contend that expert testimony is necessary to delineate Nigro's duty of care as an opining attorney from his duty of care as a title agent for Eastern, and to determine the soundness of the opinion letter in light of Nigro's duty of care. *See* Lawyers Def. Brief at 13. In support of this contention, the Lawyer Defendants cite *Sommers v. McKinney,* 287 N.J.Super. 1, 670 A.2d 99 (App.Div.1996), for the proposition that where "the soundness of an opinion is the issue, a jury will usually require the assis-

tance of an expert opinion." *Id.* at 11, 670 A.2d 99 (citations omitted).

The *Sommers* court stated that in legal malpractice actions:

Expert testimony is required in cases of professional malpractice where the matter to be addressed is so esoteric that the average juror could not form a valid judgment as to whether the conduct of the professional was reasonable. However, the facts of a given case may be such that a layperson's common knowledge is sufficient to permit a finding that the duty of care has been breached. In rare cases, expert testimony is not required in a legal malpractice action where the duty of care to a client is so basic that it may be determined by the court as a matter of law.

*Sommers,* 287 N.J.Super. at 10–11, 670 A.2d 99 (citations omitted).

The issue in *Sommers* involved an attorney's failure to give a client, Sommers, "a full and accurate assessment of the case in support of and in defense of her claims." *Sommers,* 287 N.J.Super. at 12, 670 A.2d 99 (citations omitted). In reliance on the information her attorney did give her, Sommers accepted a settlement offer below the value of her claims. *See id.* In reversing the trial court's grant of summary judgment on the basis that Sommers had failed to produce expert testimony, the Appellate Division held:

Sommers was not obliged to have an expert opine that McKinney[, her former attorney,] was required to report the settlement discussion accurately and recommend a disposition of the case based upon an accurate rendition of each party's positions. Furthermore, Sommers was not required to produce an expert to opine that, if she had been told that the [defendant in her previous case] had no defense to her ... claim, she would have changed her settlement position.

*Sommers,* 287 N.J.Super. at 12, 670 A.2d 99. Thus, in *Sommers,* McKinney's duty, to provide Sommers with accurate infor-

mation that he knew or should have known about fundamental matters affecting her case, was "so basic" that "a layperson's common knowledge [was] sufficient to permit a finding that the duty of care [had] been breached." *Id.* at 10, 670 A.2d 99 (citations omitted).

■ Similarly, in this case, Nigro's duty to disclose Fidelity's second mortgage to Home Federal, the existence of which he admitted that he knew or should have known, *see* Nigro Dep. at 78–83, 112–18; *see also* 1992 Nigro Dep. at 119–20, is not "so esoteric that the average juror could not form a valid judgment as to whether [Nigro's failure to include the second mortgage in his opinion letter] was reasonable." *Sommers,* 287 N.J.Super. at 10, 670 A.2d 99 (citations omitted). The purpose of the opinion letter was to determine Home Federal's lien priority. In considering a motion for summary judgment, this Court does not need expert testimony to conclude as a matter of law that Nigro should have included information in his opinion letter that Fidelity's second mortgage could affect Home Federal's first lien priority.

■ Furthermore, the Lawyer Defendants' contention that the Court must separately compartmentalize Nigro's duty as an attorney from his duty as principal for Eastern and title agent for Title USA is contrary to the New Jersey Supreme Court's conflicts of interest jurisprudence. In *In re Opinion 682 of the Advisory Committee on Professional Ethics,* 147 N.J. 360, 687 A.2d 1000 (1997), the New Jersey Supreme Court held that, under Rule 1.7 of the New Jersey Rules of Professional Conduct, an attorney may not own a stake in or manage a title company interested in a real estate transaction, while that same attorney is representing parties to the transaction, because of the irremediable conflicts of interest inherent in these dual roles. *See id.* at 370–73, 687 A.2d 1000.

In the Home Federal mortgage transaction, Nigro represented both the borrower-buyer, Atrium II, and the seller, MLA;

provided an opinion letter on the state of the Property's title to the lender, Homer Federal; and acted as the title agent for the title insurance company, Title USA, negotiating exceptions and closing the transaction. *See* Nigro Dep. at 66. Nigro's multi-level representations in the Home Federal mortgage closing went well beyond the "limited ministerial activities" permitted by Rule 1.7 of the New Jersey Rules of Professional Conduct. *In re Opinion 682,* 147 N.J. at 371, 687 A.2d 1000 (stating that an attorney, representing parties to a real estate transaction, may only engage in limited ministerial activities as a title agent, "such as applying purchase moneys to satisfy and cancel an existing mortgage, securing clear title for the purchaser, and obtaining from the carrier a title-insurance policy ...") (citing *Sears Mortgage Corp. v. Rose,* 134 N.J. 326, 337, 342, 634 A.2d 74 (1993)).

■ Nigro's clear violation of Rule 1.7 of the Rules of Professional conduct "can be considered evidence of [his] malpractice." *Sommers,* 287 N.J.Super. at 13, 670 A.2d 99; *see also Baxt v. Liloia,* 281 N.J.Super. 50, 57, 656 A.2d 835 (App.Div. 1995) (stating that it is well established in New Jersey that "the Rules of Professional Conduct set forth an appropriate standard of care by which to measure an attorney's conduct"). This undisputed evidence of malpractice, coupled with the evidence in the summary judgment record that Nigro admittedly knew or should have known of Fidelity's second mortgage, demonstrates that Nigro acted unreasonably in preparing the August 29, 1988, opinion letter.

Therefore, I find that there is no genuine disputed issue of material fact regarding Nigro's failure to review additional documents of record and to discover and/or disclose the existence of Fidelity's second mortgage. Accordingly, I conclude as a matter of law that Nigro breached his duty to Home Federal by failing to prepare the opinion letter of August 29, 1988, with the requisite degree of care. *See*

*Petrillo,* 139 N.J. at 489, 655 A.2d 1354. In addition, because I have found that Nigro's conduct during the Home Federal mortgage transaction violated Rule 1.7 of the New Jersey Rules of Professional Conduct, *see In re Opinion 682,* 147 N.J. at 371, 687 A.2d 1000; *see also Baldasarre v. Butler,* 132 N.J. 278, 291, 625 A.2d 458 (1993), I shall refer this matter to David E. Johnson, Jr., Esq., Director of the New Jersey Supreme Court's Office of Attorney Ethics, for whatever action he deems appropriate.

### 3. *Proximate Cause and Injury*

Recently, in *Jakelsky v. Friehling,* 33 F.Supp.2d 359 (D.N.J.1999), I discussed the issue of proximate causee under New Jersey law. I stated:

The resolution of the subtle and elusive issue of proximate cause is perhaps the most critical determination bearing on the fairness of imposing liability on an otherwise negligent defendant. The proximate cause inquiry asks whether the injury was reasonably foreseeable or was, on the contrary, a remote or abnormal incident that was not otherwise reasonably foreseeable by defendant. The tortfeasor need not foresee the precise injury; it is enough that the type of injury be within an objective realm of foreseeability. Foreseeability means that which it is objectively reasonable to expect, not merely, what might conceivably occur.

*Jakelsky,* 33 F.Supp.2d at 365 (citations, quotations and internal alterations omitted).

In cases involving claims of legal malpractice, the New Jersey Supreme Court has directed that the "substantial factor test" of proximate cause should be applied. *Conklin v. Hannoch Weisman,* 145 N.J. 395, 420, 678 A.2d 1060 (1996). In *Conklin,* the court held that, "[a]lthough ... there may be any number of concurrent causes of an injury, '[n]evertheless, these acts need not, of themselves, be capable of producing the injury; it is enough if they are a *substantial factor* in bringing it about.'" *Conklin,* 145 N.J. at 419–20, 678

A.2d 1060 (citations omitted, emphasis in original). The *Conklin* court elaborated, stating:

The substantial factor test accounts for the fact that there can be any number of intervening causes between the initial wrongful act and the final injurious consequence and does not require an unsevered connecting link between the negligent conduct and the ultimate harm. The test is thus suited for legal malpractice cases in which inadequate or inaccurate legal advice is alleged to be a concurrent cause of harm.

*See id.* In addition, "expert testimony may not be necessary to establish proximate cause in every legal malpractice case, particularly where the causal relationship between the attorney's legal malpractice and the client's loss is so obvious that the trier of fact can resolve the issue as a matter of common knowledge." *Sommers,* 287 N.J.Super. at 11, 670 A.2d 99 (citations omitted); *but see Vort v. Hollander,* 257 N.J.Super. 56, 61, 607 A.2d 1339 (App.Div. 1992) (holding that even if alleged malpractice was so blatant that it was within the ken of ordinary laypersons, expert testimony was required to establish that malpractice was proximate cause of damage to clients).

Ordinarily questions of proximate cause are left to the jury for resolution. *Jakelsky,* 33 F.Supp.2d at 366 (citation omitted). Where, however, there is no genuine issue of material fact in dispute as to proximate cause, the issue may properly be resolved on summary judgment. *See* § II *supra.*

RTC Mortgage Trust contends that Home Federal relied on the August 29, 1988, opinion letter in deciding whether to close the mortgage transaction. *See* Pl. Brief (Lawyers Def.) at 14–15. RTC Mortgage Trust further contends that Home Federal was injured when "it lost the use of the money it would have obtained [in quickly foreclosing on the Property] absent the delay caused by the title priority litigation[, based on Fidelity's undisclosed second mortgage]." *Id.* at 19.

This injury, loss of the time value of the foreclosure proceeds, RTC Mortgage Trust contends, was proximately caused by the Lawyer Defendants' breach, because but for the inaccurate opinion letter, Home Federal would not have gone through with the mortgage transaction. *See id.* at 13.

In opposing RTC Mortgage Trust's proximate cause contentions, the Lawyer Defendants, relying on *Vort v. Hollander*, 257 N.J.Super. 56, 607 A.2d 1339 (App.Div. 1992), contend that RTC Mortgage Trust has "failed to produce competent expert evidence that the [Lawyer Defendants'] alleged malpractice was a proximate cause of the damages claimed...." *See* Lawyer Defs. Brief at 19. The Lawyer Defendants further contend that the August 29, 1988, opinion letter was not a proximate cause of RTC Mortgage Trust's injury because HomeFed's losses, if any, were caused by the collapse of the real estate market for commercial office space, and because the "opinion letter did not insure against challenges to HomeFed's first lien position" *Id.* at 20.

First, the Lawyer Defendants' reliance on *Vort* is misplaced. In *Vort,* the trial court had ordered the client to obtain expert reports opining as to the professional performance of his attorney. *Vort,* 257 N.J.Super. at 60, 607 A.2d 1339. The client failed to do so, and the trial court granted the attorney's motion for summary judgment on the ground that the malpractice claim was baseless, and that the client had failed to substantiate his claim with expert reports. *Id.* at 61, 607 A.2d 1339. The Appellate Division affirmed. After noting that the trial court had repeatedly stated that the client's claim was nonsensical, *see id.* (noting that trial court repeatedly stated that "[m]ost of what I see in this complaint and all of the pleadings is absolutely nonsense"), the panel held: "Clearly expert testimony was required in light of this judicial observation as to the merits of appellant's underlying claim." *Id.* Thus, the Appellate Division limited its holding in *Vort* to the peculiar facts of the case. The holding in *Vort* cannot be extended and applied be-

yond those cases involving claims for legal malpractice where expert testimony is required to define the scope of the defendant-attorney's duty and breach, if any. As I have previously stated, *see* § III.A.2 *supra,* that is not this case. Accordingly, *Vort* is clearly distinguishable from RTC Mortgage Trust's claim for legal malpractice against the Lawyer Defendants.

 Second, in contending that the opinion letter did not insure against title priority disputes or a declining real estate market, the Lawyer Defendants misconstrue the substantial factor test, articulated in *Conklin.* In determining the existence of proximate cause, "'the actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm." *Jakelsky,* 33 F.Supp.2d at 365 (citation omitted). In legal malpractice actions, "[t]he negligent attorney ... often does not 'create' the risk of intervening harm (the attorney does not make the borrower more likely to become insolvent), but rather fails to take steps that competent counsel should take to protect a client from the risks that ultimately produce the injury." *Conklin,* 145 N.J. at 418, 678 A.2d 1060 (citation omitted, parenthetical in original). Thus, the issue is not whether the Lawyer Defendants directly caused RTC Mortgage Trust's claimed injury; rather, the issue is whether the Lawyer Defendants, through their opinion letter, failed "to protect a client from the risks that ultimately produce[d] the injury[,]" *Id., i.e.,* if the Lawyer Defendants had protected Home Federal from the risk, would the injury have resulted? In other words, to resolve the issue of proximate cause, I must determine whether Home Federal would have proceeded with the mortgage transaction, if the opinion letter disclosed the existence of Fidelity's second mortgage. In considering this question, I find that there is no genuine issue

of material fact in dispute that Home Federal would not have closed the mortgage transaction if the opinion letter had disclosed the existence of Fidelity's second mortgage.

In its loan commitment letter, dated June 8, 1988, Home Federal stated that a requirement for proceeding with the mortgage transaction was receipt of an opinion letter from the Lawyer Defendants, opining that the mortgage "constitute[d] a first lien security interest valid against all third parties, subject only to the matters and exceptions referenced to in [the] Title Commitment." *See* Adler Cert., Exh. H. In addition, in the August 29, 1988, closing instruction letter provided to Nigro and Winfree, as closing agents for Title USA, Home Federal reiterated its condition that the transaction not proceed unless it obtained first lien priority. The closing instruction letter provided:

> Please record the [loan documents] ... WHEN AND ONLY WHEN such Mortgage constitutes, in fact, a first lien of record against the Property ... and when ... Title USA can affirmatively insure Home Federal as of the date and time of recordation that such Mortgage constitutes a valid first lien against the Property.... You are authorized to disburse the Proceeds in accordance with these instructions WHEN AND ONLY WHEN you are able to strictly comply the[se] instructions....

*See* Adler Cert., Exh. L, ¶¶ 4–5. Thus, while the closing instruction letter and the loan commitment letter were not directed specifically to the Lawyer Defendants, the Lawyer Defendants, as counsel for Diemer and Atrium II, and Nigro, as closing agent for Title USA, were clearly aware of Home Federal's pre-condition to closing the transaction, namely, that the mortgage "in fact" be a first priority lien. *See id.*

In addition, Larry Goodman, Esq., counsel for Home Federal and Nationwide Capital, testified in an affidavit, filed with the Bankruptcy Court during the title priority litigation, that:

> I was not aware that the Second Mortgage existed as of August 29, 1988. In fact, if I were aware of the Second Mortgage at the time of closing I would not have permitted my client, HomeFed, to extend the loan to Atrium II ... unless Fidelity's Second mortgage was discharged of record so as to remove any doubt to the first lien status of the HomeFed mortgage.

*See* Adler Certification in Opposition to Summary Judgment Motion of Nations Title Insurance Company (filed Dec. 14, 1998) (hereinafter "Adler Cert. (NTI)"), Exh. B (Affidavit of Larry Goodman, Esq. (dated Mar. 20, 1992)).

The Lawyer Defendants contend that Home Federal "would have gone through with this transaction regardless of the issue of the second mortgage[, because Home Federal] simply would have requested greater protection in the title policy...." *See* Lawyer Defs. Brief at 28. The Lawyer Defendants further contend that RTC Mortgage Trust's "assertion that [Home Federal] would not have proceeded with the mortgage loan ... is based upon an oral opinion of the Bankruptcy Court, which plaintiff presents as an undisputed fact." *Id.* at 26.

These contentions are without merit. First, to demonstrate the existence of a genuine issue of material fact, the Lawyer Defendants must "go beyond the pleadings and by [their] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. The Lawyer Defendants have not done so as to the issue of whether Home Federal would or would not have gone through with the transaction. Second, the Court is not relying upon the Bankruptcy Court's finding of fact. As I have discussed above, numerous other undisputed facts in the summary judgment record demonstrate that Home Federal would not have closed the transaction if it had known of the existence of Fidelity's

second mortgage, specifically, Home Federal's conditions for proceeding with the transaction set forth in the loan commitment letter, the unequivocal terms of Home Federal's closing instruction letter, and the sworn statement of Larry Goodman, Esq. *See supra.*

Thus, I conclude that the undisputed evidence in the summary judgment record establishes that Home Federal would not have gone through with the mortgage transaction if the opinion letter had disclosed the existence of Fidelity's second mortgage. In addition, given that the Lawyer Defendants were aware that Home Federal was relying upon the opinion letter to give an accurate statement as to their lien position, *see* § III.A.1–2 *supra*, it was "within the realm of foreseeability that some harm might result" to Home Federal, and its successors in interest, from Nigro's failure to discover and/or disclose Fidelity's second mortgage in the August 29, 1988, opinion letter. *Conklin,* 145 N.J. at 421, 678 A.2d 1060. As the New Jersey Supreme Court observed in *Conklin,* "although it may not have been foreseeable that [the borrowers] would become insolvent, the consequences of insolvency[, including foreclosure and the risk of a title priority action] were always plainly foreseeable." *Id.* Accordingly, I conclude that the Lawyer Defendants' failure to discover or disclose the existence of Fidelity's second mortgage was a substantial factor in causing Home Federal "exposure to an unwarranted risk of harm[,]" namely, the loss of the time value of the foreclosure proceeds due to the protracted title priority litigation with Fidelity. *Id.*

Therefore, having determined that the Lawyer Defendants owed Home Federal a duty of care in preparing the opinion letter, and that no genuine issue of material fact exists as to whether the Lawyer Defendants breached their duty of care, and whether the breach proximately caused Home Federal injury, I conclude that RTC Mortgage Trust is entitled to partial summary judgment on the issue of the Lawyer Defendants' liability on Plaintiff's claim for legal malpractice. Accordingly, I shall

grant RTC Mortgage Trust's motion for partial summary judgment.

### 4. *Respondeat Superior Liability*

Caine, DiPasqua contends that it cannot be held liable to RTC Mortgage Trust based on the doctrine of *respondeat superior* because the Court has yet to determine whether the law of Pennsylvania or New Jersey should apply, given Caine, DiPasqua's professional corporation status. *See* Lawyer Defs. Brief at 23. On the contrary, Caine, DiPasqua's contention does not preclude this Court from considering RTC Mortgage Trust's motion for partial summary judgment on the issue of liability.

 . "As a federal court sitting in diversity, this Court is obliged to apply the choice of law rules of the forum state—in this case, New Jersey." *Capone v. Nadig,* 963 F.Supp. 409, 412 (D.N.J.1997) (Orlofksy, J.) (citing *Klaxon v. Stentor Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)); *see also Slater v. Skyhawk Transp., Inc.,* 187 F.R.D. 185, 192 (D.N.J. 1999) (Orlofsky, J.). New Jersey applies a flexible "governmental interest" analysis requiring "application of the law of the state with the greatest interest in resolving the particular issue." *Capone,* 963 F.Supp. at 412 (quoting *Gantes v. Kason Corp.,* 145 N.J. 478, 484, 679 A.2d 106 (1996)) (internal quotations omitted).

 The first step in the governmental interest analysis is determining whether an actual conflict exists between the laws of the interested states. *See Slater,* at 192; *Capone,* 963 F.Supp. at 412. If a court determines that an actual conflict exists, then a court must weigh the competing states' interests. *See Capone,* 963 F.Supp. at 412. In the absence of an actual conflict, the court applies the law of the forum state. *See id.* at 188, n. 1 (citing *Amoroso v. Burdette Tomlin Mem'l Hosp.,* 901 F.Supp. 900, 905 (D.N.J.1995) (Irenas, J.)).

Because I conclude that there is no conflict between the law of Pennsylvania and New Jersey as to the liability of professional corporations for the negligent acts of their employees, I need not weigh the competing interests of these two states. *Compare* 15 Pa. Cons.Stat. Ann. § 2925(c) (providing that "[t]he professional corporation shall be liable up to the full value of its property for any negligent or wrongful acts or misconduct committed by any of its officers, shareholders, employees or agents while they are engaged on behalf of the corporation rendering professional services"), *with* N.J. Stat. Ann. § 14A:17–8 (same);[11] *see also Slater*, at 192 (collecting cases counseling District Courts to avoid "false conflicts" in resolving choice of law issues).

■ Thus, because it is undisputed that Nigro was acting on behalf of Caine, DiPasqua when he prepared the August 29, 1988, opinion letter, *see* Adler Cert., Exh. R; *see also* Nigro Dep. at 10–11, and because it is also undisputed that Nigro was an officer, shareholder and employee of Caine, DiPasqua at that time, *see* Nigro Dep. at 10–11; *see also* Deposition of Melvin E. Caine, Esq. (dated Apr. 7, 1998) at 5–6, 29, for the reasons set forth in section III.A.1–3, I conclude that Caine, DiPasqua "shall be liable up to the full value of its property for [the] negligent ... acts ... committed by" Nigro. *See* N.J. Stat. Ann. § 14A:17–8; *see also* 15 Pa. Cons.Stat. Ann. Accordingly, I shall grant RTC Mortgage Trust's motion for partial summary judgment on the issue of liability against Caine, DiPasqua, under the doctrine of *respondeat superior*.

B. *FNTIC's and NTI's Motion for Summary Judgment*

1. *FNTIC Is Not Title USA's Successor*

In the Amended Complaint, RTC Mortgage Trust alleges that, "[a]t the time HomeFed extended its mortgage loan to Atrium II, Atrium II obtained at HomeFed's instruction and for the benefit of HomeFed a title insurance binder and commitment and a mortgage policy of title insurance issued by Title USA...." *See* Amended Compl., ¶ 7. RTC Mortgage Trust also alleges that "[u]pon information and belief Fidelity National Title Insurance Company ... is the successor in interest to TRW Title Insurance of New York[, which] ... was the successor in interest to Title USA and succeeded to all rights and liabilities of Title USA...." *Id.*, ¶¶ 2, 8.

FNTIC, however, has placed undisputed evidence in the summary judgment record that "[NTI] is the successor in interest to TRW Title Insurance Company of New York[, and that] TRW title is the successor in interest to Title USA...." *See* NTI R. 56.1, ¶ 1, Exh. A. (Certification of Theresa Garelli, Esq. (dated Nov. 16, 1998), ¶¶ 1–8). FNTIC has also placed undisputed evidence in the summary judgment record that "[FNTIC] is not the successor to either Title USA or TRW Title and has assumed no responsibility for the title insurance at issue." *Id.*, ¶ 1, Exh. A, ¶¶ 1–8.

Therefore, because there is no genuine issue of material fact in dispute as to whether FNTIC is the successor in interest to Title USA, I conclude that FNTIC is entitled to a judgment as a matter of law, dismissing it from this matter. Accordingly, I shall grant FNTIC's cross-motion for summary judgment.

2. *NTI's Motion for Summary Judgment*

a. *RTC Mortgage Trust's Claim Against NTI for Breach of the Title Insurance Policy*

In the Amended Complaint, RTC Mortgage Trust alleges that "[t]he failure of Title USA to discover the recorded liens of Fidelity ... [was] in breach of its contrac-

---

**11.** The Court's research has uncovered no cases from either Pennsylvania or New Jersey that would give the Court reason to think that the identical language of the two Professional Corporation statutes would be or should be construed to be in conflict.

tual relationship with HomeFed." *See* Amended Compl., ¶ 21. In support of its motion for summary judgment, NTI contends that "its obligations under the title policy have been satisfied" because "[NTI] was successful in establishing HomeFed's [first lien] priority in the adversary proceeding[.]" *See* NTI's Brief in Opposition to Plaintiff's Motion for Summary Judgment and in Support of NTI's Cross–Motion for Summary Judgment (filed Dec. 14, 1998) at 31. In addition, NTI contends that RTC Mortgage Trust has not suffered an actual loss, as required by the terms of the policy, before a determination of Title USA's liability can be made. *See id.* at 34.

In opposing NTI's motion for summary judgment on its breach of contract claim, RTC Mortgage Trust contends that NTI's proposed construction of the title policy on the issue of actual loss is contrary to the reasonable expectations of the insured, Home Federal. *See* RTC Mortgage Trust's Memorandum of Law in Opposition to Motion of NTI for Summary Judgment (filed Dec. 14, 1998) at 37 (referencing RTC Mortgage Trust's Memorandum of Law in Opposition to Motion of LTIC for Summary Judgment (filed Dec. 14, 1998) at 19) (hereinafter "Pl. Brief (NTI)" and "Pl. Brief (LTIC)," respectively). RTC Mortgage Trust also contends that NTI breached the terms of the title policy by failing to remove the title defect, namely, Fidelity's second mortgage, within a "reasonable time" after notice of the defect. *See* Pl. Brief (NTI) at 37; *see also* Pl. Brief (LTIC) at 24–27.

### 1) *Legal Standard Governing Construction of Title Insurance Policies*

Recently, in *Stewart Title Guar. Co. v. Greenlands Realty Co.*, 58 F.Supp.2d 370, 381 (D.N.J.1990), I discussed the legal standard governing the construction of title insurance policies. *See id.* at 381. "Certain well-established rules for interpreting insurance policies have developed from that understanding of the nature of insurance policies." *Id.* (quoting *Gibson v. Callaghan*, 158 N.J. 662, 730 A.2d 1278, 1282 (1999)). "A title insurance policy 'is subject to the same rules of construction as are other insurance policies.'" *Stewart Title*, at 381 (quoting *Sandler v. New Jersey Realty Title Ins. Co.*, 36 N.J. 471, 479, 178 A.2d 1 (1962)). "Generally, the words of an insurance policy are to be given their plain, ordinary meaning." *Id.* (quoting *Gibson*, 158 N.J. 662, 730 A.2d 1278, 1282). "Basic to this problem of construction is a recognition of the principle that in such policies the phraseology must be liberally construed in favor of the insured and strictly construed against the insurer." *Sandler*, 36 N.J. at 479, 178 A.2d 1; *see also Gibson*, 158 N.J. 662, 730 A.2d 1278, 1282; *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 N.J. 517, 528–29, 562 A.2d 208 (1989); *see Stewart Title*, at 381. "Further, they must be interpreted in a way which fulfills the reasonable expectations of the insured." *Stewart Title*, 58 F.Supp.2d at 381 (quoting *Summonte v. First American Title Ins. Co.*, 180 N.J.Super. 605, 610, 436 A.2d 110 (Ct. Ch. Div.), *aff'd*, 184 N.J.Super. 96, 445 A.2d 409 (Ct. App.1981), *certif. denied*, 89 N.J. 418, 446 A.2d 148 (1982)); *see also Gibson*, 158 N.J. 662, 730 A.2d 1278, 1282.

"Notwithstanding th[ose] principle[s] of construction, courts should not write for the insured a better policy of insurance than the one purchased." *Walker Rogge*, 116 N.J. at 529, 562 A.2d 208; *see also Stewart Title*, at 381. "Where the insured is both sophisticated and knowledgeable, and the policy was the product of negotiation, *i.e.*, where the evidence establishes that the insurance policy was not a contract of adhesion, the court should not apply the rule of strict construction against the insurer." *Stewart Title*, at 381 (citing *First National Bank of Palmerton v. Motor Club of America Ins. Co.*, 310 N.J.Super. 1, 7–8, 708 A.2d 69 (App.Div.1997)). "Thus, a court must enforce the policy as written when its meaning and language is clear and unambiguous, and the terms do

not contradict the reasonable expectations of the insured." *Stewart Title,* at 381 (citations and internal quotations omitted).

### 2) *Title USA Did Not Breach the Title Insurance Policy*

■■■ The meaning of the terms of a title insurance policy, like all contracts, is a question of law for the Court. *See Horn v. Mazda Motor of America, Inc.,* 265 N.J.Super. 47, 60 n. 5, 625 A.2d 548 (App. Div.1993). The policy at issue in this case provides, in relevant part:

> [Title USA], at its own cost and without undue delay, shall provide for the defense of an insured in all litigation consisting of actions or proceedings commenced against such insured, or defenses, restraining orders or injunctions interposed against a foreclosure of the insured mortgage ... *to the extent that such litigation is founded upon an alleged defect, lien, encumbrance, or other matter insured against by the policy...*
>
> . . .
>
> Whenever [Title USA] shall have brought any action or interposed a defense as required or permitted by the provisions of this policy, *[Title USA] may pursue any such litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order ...*
>
> . . .
>
> The liability of [Title USA] under this policy shall in no case exceed the least of:
>
> (i) the *actual loss of the insured claimant;* or
>
> (ii) the amount of insurance stated ... [in this policy; or]
>
> (iii) the amount of the indebtedness secured by the insured mortgage ...
>
> . . .
>
> No claim shall arise or be maintainable under this policy:
>
> (a) if [Title USA], after having received notice of an alleged defect, lien

or encumbrance insured against hereunder, by litigation or otherwise, removes such defect, lien or encumbrance or establishes the title, or lien of the insured mortgage, as insured, within a reasonable time after receipt of such notice;

> (b) *in the event of litigation until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured*
>
> . . . .

*See* Adler Cert., Exh. W (Title Insurance Policy, §§ 3, 6, 7) (emphasis added).

The parties do not dispute that, after Home Federal notified Title USA of Fidelity's adversary proceeding, filed in the Bankruptcy Court to establish the priority of its second mortgage, in May, 1991, Title USA "retained counsel[, Madden & Madden,] to defend [Home Federal] in the adversary proceeding." *See* Pl. R. 56.1 (Cts.IV–V), ¶ 26; *see also* LTIC R. 56.1, Exh. D (Deposition of Sarah J. Jelin, Esq.). Home Federal's attorney, Sarah J. Jelin, Esq., who represented Home Federal briefly at the beginning of the title priority litigation, testified that Title USA "paid the attorneys' fees incurred by [Home Federal] during Ms. Jelin's representation of [Home Federal] in the priority dispute." *See* LTIC R. 56.1, ¶ 27, Exh. D. Ms. Jelin further testified that "[Home Federal] was satisfied with Madden & Madden's representation in the adversary proceeding and never questioned the law firm's conduct in representing [Home Federal]." *Id.*

In the title priority litigation, on June 1, 1992, the Bankruptcy Court originally held that Fidelity had a first lien on the Property to the extent of the unpaid balance on its second mortgage, specifically, $5,610,-654.48. After Title USA appealed, on January 12, 1994, the District Court reversed the Bankruptcy Court's opinion and order, and remanded for further proceedings. On January 24, 1994, the Bankruptcy

Court again entered a judgment in favor of Fidelity. "[T]he District Court reversed the Bankruptcy Court and ruled that, pursuant to the doctrine of equitable subrogation, to the extent that HomeFed paid off the first (construction) mortgage of Fidelity, *i.e.*[,] $10,982,446.89, it was entitled to priority over the Fidelity 'second mortgage.'" *See* Pl. R. 56.1, ¶ 30. "The Third Circuit affirmed the decision in August, 1995." *RTC II*, 16 F.Supp.2d at 559; *see also In re Atrium II Ltd. Partnership*, 60 F.3d 816 (3d Cir.1995) (mem.).

The essence of NTI's argument is that, because Title USA ultimately achieved a positive result for HomeFed in the title priority litigation, Title USA, and NTI as its successor in interest, did not breach the title insurance policy. *See* NTI Brief at 31. Specifically, NTI contends that under the terms of the policy, NTI could only be liable to RTC Mortgage Trust for breach if the title priority litigation had concluded with "a final determination ... adverse to ... the lien of the insured mortgage, as insured ..." *See id.; see also* Adler Cert., Exh. W.

▮ Because resolution of the title priority litigation took over four years, RTC Mortgage Trust contends that Title USA breached the terms of the policy by not removing Fidelity's second mortgage within a reasonable time. *See* Pl. Brief (NTI) at 37; *see also* Pl. Brief (LTIC) at 23–24. In addition, RTC Mortgage Trust contends the delay in establishing its first lien priority "violate[d] the reasonable expectations of the insured...." *See* Pl. Brief (LTIC) at 24. After reviewing the undisputed evidence in the summary judgment record, I conclude that RTC Mortgage Trust's contentions and proffered expectations are unreasonable in light of the unambiguous meaning of the terms of the title insurance policy.

Paragraph 3(d) of the policy unambiguously gave Title USA the right to "pursue any [title priority] litigation to [a] final determination...." *See* Adler Cert., Exh. W, ¶ 3(d). In conjunction with this right, paragraph 5 of the policy gave Title USA the option to defend the insured's interest in the title, to settle any litigation and compensate the insured for its actual loss, or to purchase the outstanding indebtedness. *See id.*, ¶ 5. In addition, paragraph 7(b) of the policy clearly states that, "in the event of litigation[,]" Title USA could only be held liable if there had "been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom[.]" *See id.*, ¶ 7(b).

To construe Title USA's obligations under the paragraphs 7(a-b) of the policy in the manner suggested by RTC Mortgage Trust would require this Court to conclude that in the event of litigation, Title USA was required to obtain a swift final judgment in HomeFed favor or be forced to settle and compensate HomeFed, or purchase the outstanding indebtedness. Such a construction of the policy would be patently unreasonable. The time in which it takes to obtain a final determination, including the disposition of all appeals, is outside the control of the defending title insurance company. No reasonable insured could expect a title insurance company to institute or defend a title priority suit knowing that it may have to abandon a meritorious claim or defense because of delays at the courthouse.

In *Summonte*, construing policy language identical to the language in paragraphs 7(a-b), the court stated that the "reasonable time" provision of paragraph 7(a) was implicated in those situations where "no litigation had commenced requiring a defense[.]" *Summonte*, 180 N.J.Super. at 615, 436 A.2d 110. Thus, the clear implication of *Summonte*, given the unambiguous language of paragraph 7(b), is that the "reasonable time" provision of paragraph 7(a) does not apply "in the event of litigation[.]" *See* Adler Cert., Exh. W, ¶ 7(a-b).

Therefore, I conclude that a sophisticated insured, like HomeFed, in the business of making commercial loans, could not reasonably expect that the terms of the title policy required the insurer, Title USA, to

abandon a meritorious, and ultimately successful, defense. A contrary conclusion would clearly be unreasonable, particularly in light of the undisputed evidence in the record that HomeFed was satisfied with Title USA's title defense, having no "objection to the speed at which [it] did it." *See* LTIC R. 56.1, Exh. D. (Jelin Dep. at 102). Accordingly, RTC Mortgage Trust's contention that Title USA failed to obtain a positive resolution to the title priority litigation within a reasonable time is without merit.

■ RTC Mortgage Trust contends, however, that Title USA did breach the terms of the title policy because HomeFed incurred losses during the pendency of the title priority litigation, in the form of carrying charges and the lost time value of the foreclosure proceeds. *See* Pl. Brief (LTIC) at 29. RTC Mortgage Trust, however, misconstrues the losses against which the title policy insured. These "losses" are not recoverable under the policy for two reasons. First, Title USA fulfilled its obligations under the policy. It defended HomeFed's interest in the Property, and obtained a positive result, namely that HomeFed's mortgage occupied a first lien priority up to $10,982,446.89. To hold NTI liable for breach of the title policy, in effect would hold it liable for having performed all that it was required to do under the terms of the policy. *Walker Rogge*, 116 N.J. at 535, 562 A.2d 208 (holding that title insurance company's liability is governed by the terms of the policy).

Second, a mortgagee's title insurance policy does not insure against carrying charges and the lost time value of foreclosure proceeds. The purpose of a mortgagee title insurance policy is "to indemnify against loss or damage sustained by reason of defects of title or liens upon the land[; it] ... does not guarantee either that the mortgaged premises are worth the amount of the mortgage or that the mortgage debt will be paid." *Blackhawk Prod. Credit Assoc. v. Chicago Title Ins. Co.*, 144 Wis.2d 68, 423 N.W.2d 521, 525 (1988); *accord Green v. Evesham Corp.*,

179 N.J.Super. 105, 109, 430 A.2d 944 (App.Div.1981); 9 John A. Appleman et al., *Insurance Law and Practice* § 5216 (1981 & 1999 Supp.).

"[G]enerally, the actual loss to a mortgagee arising from a title insurance company's failure to disclose or except, in the mortgagee's policy, a superior lien on property was the difference between the value of the mortgagee's security interest had title been as described in the policy and the value of the mortgage subject to the title defect." *See* 9 Appleman, § 5216; *see also Blackhawk Prod. Credit Assoc.*, 423 N.W.2d at 525–26 (stating that "the insured must show that the security of the insured lien was in fact impaired by the prior lien[; a]bsent such a showing, the insured has not presented evidence sufficient to establish a claim of actual loss or damage sustained or incurred") (citing D. Barlow Burke, *Law of Title Insurance* § 2.2 at 32–33 (1987)); *accord Focus Investment Assocs., Inc. v. American Title Ins. Co.*, 992 F.2d 1231, 1237 n. 10 (1st Cir.1993); *First Federal Savings and Loan Assoc. of Fargo, North Dakota v. Transamerica Title Ins. Co.*, 19 F.3d 528, 530 (10th Cir.1994).

■ In this case, RTC Mortgage Trust has not demonstrated that Fidelity's second mortgage resulted in any diminution of its security. Admittedly, the HomeFed mortgage was for $13.5 million and the result obtained by Title USA in the title priority litigation gave HomeFed a first lien priority up to $10.9 million. The "insurable interest[, however,] is the 'fair market value of the realty ... and is not controlled by the original purchase price.'" *Allison v. Ticor Title Ins. Co.*, 907 F.2d 645, 651 (7th Cir.1990) (citing *Blackhawk Prod. Credit Assoc.*, 423 N.W.2d at 526, and quoting *Atlanta Title & Trust Co. v. Allied Mortgage Co.*, 64 Ga.App. 38, 12 S.E.2d 147, 149 (1940)). Thus, in determining whether HomeFed sustained an actual loss as a result of Fidelity's second mortgage, I must determine whether the existence of the second mortgage caused a

decrease in the fair market value of HomeFed's security.

At the time HomeFed initiated foreclosure proceedings on November 7, 1990, *see* LTIC R. 56.1, ¶ 23, the fair market value of the Property was between $4.3 and $5.9 million dollars. *See* NTI Reply Brief, Exh. A (Appraisal of Herskowitz, Rosen & Walton (dated Sept. 28, 1998) (appraising the Property, if sold at foreclosure on September 1, 1992, at $4,280,000)); · Certification of Charles J. Vinicombe, Esq. (dated December 14, 1998), Exh. P (BEI Investment Committee Report (dated Aug. 24, 1994) (compiling appraisals of the Property, reflecting the following fair market values: $5,000,000; $5,250,000; and $5,877,-000). The Property was ultimately sold on November 21, 1994 for $5 million. *See* LTIC R.56.1, ¶ 37. Thus, if the fair market value of the Property was between $4.3 and 5.9 million, far less than HomeFed's first lien priority of $10.9 million, the existence of Fidelity's second mortgage could not diminish the value of HomeFed's security. *See Blackhawk Prod. Credit Assoc.,* 423 N.W.2d at 526 (stating that "[i]f the interest held by [the complaining mortgagee] was valueless without the superior lien, it cannot claim lost value because the lien existed"). Accordingly, HomeFed suffered no actual loss to its insurable interest.

It is undisputed that the Property suffered a precipitous loss in value between 1988 and 1994. RTC Mortgage Trust, however, has put no evidence in the summary judgment record to demonstrate that the loss in value was caused by the existence of Fidelity's second mortgage, especially since the second mortgage had been subrogated to HomeFed's first lien priority of $10.9. *See id.* (stating that "[t]he mere fact of an undisclosed prior lien is insufficient to establish [a] claim; a showing that the prior lien renders the insured lien 'insecure' must be made as well") (quoting Burke, *Law of Title Insurance,* § 2.2).

Therefore, I find, based on the undisputed facts contained in the summary judgment record, that Title USA did not breach the terms of the title insurance policy in defending HomeFed's first lien priority. Alternatively, I further find that there could be no breach of the terms of the policy because HomeFed suffered no recoverable loss to its insurable interest due to the pendency of the title priority litigation. Accordingly, I shall grant NTI's motion for summary judgment on RTC Mortgage Trust's claim for breach of contract.[12]

### b. *RTC Mortgage Trust's Claim for Negligent Title Search Against NTI*

In the Amended Complaint, RTC Mortgage Trust alleges that "[t]he failure of Title USA to discover the recorded liens of Fidelity ... was negligent ..." *See* Amended Compl., ¶ 21. RTC Mortgage Trust further alleges that its "claim[ ] based on ... negligence ... [is] not limited by the terms of the title insurance policy[, and that] ... plaintiff is entitled to all damages which arose out of the failure of Title USA to correctly search the land records and locate the ... prior liens held by Fidelity...." *Id.,* ¶ 24.

On its claim for negligent title search, RTC Mortgage Trust has moved for partial summary judgment on the issue of liability. *See* RTC Mortgage Trust's Notice of Motion for Partial Summary Judgment Against NTI (filed Dec. 14, 1998). In opposition to RTC Mortgage Trust's motion for partial summary judgment, NTI has cross-moved for summary judgment on RTC Mortgage Trust's claim for negligent title search, contending that the duties owed by Title USA to HomeFed were governed by the terms of the title insurance policy, and that Title USA did not assume any duty independent of those set forth in the policy. *See* NTI's Brief at 11–23.

---

**12.** Having granted NTI's motion for summary judgment for RTC Mortgage Trust's failure to raise a genuine issue of material fact about the existence of a breach of the terms of the policy, I need not address NTI's argument that the claim is barred by New Jersey's statute of limitations. *See* N.J. Stat. Ann. § 2A:14–1; *but see* § III.B.2.d *infra.*

In *Walker Rogge,* 116 N.J. 517, 562 A.2d 208, the New Jersey Supreme Court held that "a title company's liability is limited to the policy and . . . the company is not liable in tort for negligence," *id.* at 535, 562 A.2d 208, unless the company engaged in conduct by which it voluntarily assumed a duty in addition to those obligations created by the policy. *See id.* at 541, 562 A.2d 208; *see also Stewart Title* at 386. "Thus, unless the insurer engages in affirmative conduct to assume a duty voluntarily on behalf of the insured, the title insurance policy governs the relationship between the insured and the insurer and limits the causes of action which the insured may assert against the insurer." *Stewart Title,* at 386 (citing *Walker Rogge,* 116 N.J. at at 540, 562 A.2d 208 (stating that "[a]lthough we recognize that an insured expects a title company will conduct a reasonable title examination, the relationship is essentially contractual")).

Unlike the plaintiff in *Stewart Title,* who had failed to allege that the title company owed the plaintiff a duty independent of its obligations under the policy, *see Stewart Title,* at 387, RTC Mortgage Trust alleges in its Amended Complaint that its claim for negligent title search against NTI is independent of and "not limited by the terms of the title insurance policy[.]" *See* Amended Compl., ¶ 24. Thus in resolving RTC Mortgage Trust's motion for partial summary judgment and NTI's cross-motion for summary judgment, I must determine whether "[Title USA] engage[d] in affirmative conduct to assume a duty voluntarily on behalf of [its] insured[, Home Federal.]" *Stewart Title,* at 386 (citing *Walker Rogge,* 116 N.J. at 540–41, 562 A.2d 208).

Because both parties cite *Walker Rogge* in support of their respective positions, I find it necessary to discuss the New Jersey Supreme Court's opinion in greater detail. In *Walker Rogge,* the Supreme

Court first considered the "question [of] whether the issuance of the title commitment and policy place[d] a duty on a title insurance company to search for and disclose to the insured any reasonably discoverable information that would affect the insured's decision to close" the transaction. *Walker Rogge,* 116 N.J. at 535, 562 A.2d 208. The court answered this question in the negative, stating that "the duty of the title company, unlike the duty of a title searcher, does not depend on negligence, but on the agreement between the parties." *Id.* at 535, 562 A.2d 208. The *Walker Rogge* court went on, however, to qualify this conclusion:

> If . . . the title company agrees to conduct a search and provide the insured with an abstract of title in addition to the title policy, it may expose itself to liability for negligence as a title searcher in addition to its liability under the policy. . . .
>
> . . .
>
> Notwithstanding the essentially contractual nature of the relationship between a title company and its insured, the company could be subject to a negligence action if the act complained of was the direct result of duties voluntarily assumed by the insurer in addition to the mere contract to insure title.

*Walker Rogge,* 116 N.J. at 535, 541, 562 A.2d 208 (citations and internal quotations omitted).

The *Walker Rogge* court also discussed the facts which do or do not tend to suggest that a title insurance company voluntarily assumed the duty to search title for the benefit of the insured. First, the fact that the title insurance company charged the insured a separate fee for a title search does not necessarily establish that the company voluntarily assumed duties in addition to and independent of its obligations in the policy. *See id.* at 536, 562 A.2d 208; *see also Stewart Title,* at 386. Second, while the statutory obligation set forth in N.J. Stat. Ann. § 17:46B–1 *et seq.,*[13] requires a title company to make a reason-

---

**13.** Section 17:46B–9 provides, in relevant part:

able title search prior to issuing a policy of insurance, the statute does not require the title insurance company to "prepare a separate abstract of title for [the insured."] *Walker Rogge,* 116 N.J. at 536, 562 A.2d 208. Rather, the title insurance company complies with the requirements of the statute when it "ma[kes] the search for its own benefit." *Id.*

Other facts discussed in *Walker Rogge* are particularly relevant to the issue of whether Title USA assumed a duty to search title for the benefit of Home Federal. In *Walker Rogge,* the Supreme Court stated:

> [The title company] had twice insured the property in question and on four other occasions it had opened files on the property ... [The title company's] own back title plant reflected th[e title error at issue.] One of [the title company's] employees, moreover, supervised the closing ...

*Id.* at 541, 562 A.2d 208. Given this circumstantial evidence, the *Walker Rogge* court remanded the matter to the trial court to "determine whether [the title company] assumed an independent duty to [search title for the benefit of the insured,] whether it breached that duty, or whether the breach caused any damage to [the insured.]" *Id.*

On remand, the trial court found that the title company knew or should have known of the title defect, based on its extensive records on the property. *See Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.,* 254 N.J.Super. 380, 384, 603 A.2d 557 (App.Div.1992). On the appeal after remand, the Appellate Division held that the trial court misapplied the rule set forth in the Supreme Court's opinion, stating that the court was "unable to discern from the trial judge's opinion that he con-

sidered or determined the paramount question presented on remand: Whether [the title company] voluntarily assumed any duties in addition to issuing the title policy." *See id.* at 384–85, 603 A.2d 557. The Appellate Division observed that whether the title company knew or should have known of the defect was not the same as whether it had assumed a duty to search title for the benefit of the insured. *Id.*

Applying the New Jersey Supreme Court's opinion, the Appellate Division held that the title insurance company's "independent duty to plaintiff would have to arise from some ... contract or obligation[,]" other than the title insurance policy. *Walker Rogge,* 254 N.J.Super. at 385, 603 A.2d 557. Reviewing the evidence of the transaction, the Appellate Division concluded that the title company "could have assumed an additional independent duty in its capacity as title closing agent; however, [this basis of liability had not been] ... explored ... in any detail." *Id.* The Appellate division further observed:

> Nothing in the record establishes the "settlement clerk's" duties or the reasonable expectations of [an insured] contracting for the services of a title closing agent in the locale in question. [Plaintiff] testified that he expected a settlement clerk to adjust the figures, make settlement between the parties and to make sure that the deed was in order and the description in the deed was correct. [Plaintiff's] expectations and a settlement clerk's or closing agent's duties may be quite different things. Indeed, *the title company may have undertaken greater professional and legal responsibility than permitted by law and may have thereby assumed the duty to pro-*

---

No policy or contract of title insurance shall be written unless and until the title insurance company has caused to be conducted a reasonable examination of the title and has caused to be made a determination of insurability of title in accordance with sound underwriting practices for title insur-

ance companies. Evidence thereof shall be preserved and retained in the files of the title insurance company or its agent for a period of not less than 15 years after the policy or contract of title insurance has been issued.

*See* N.J. Stat. Ann. § 17:46B–9.

*vide the same protection as would have been provided by competent counsel.*
*Id.* at 385–86, 603 A.2d 557 (citations, footnote, quotations and internal alterations omitted, emphasis added).

As the *Walker Rogge* opinions make clear, the standard for determining the existence of a title insurance company's independent duty to search title for the benefit of the insured is extremely fact intensive. In this case, the inquiry into whether Title USA assumed such a duty is further complicated by the fact that Nigro: (1) opined as to the state of title for the benefit of Home Federal; *see* Adler Cert., Exhs. H, R, (2) was the president, sole-shareholder and director of Eastern, Title USA's agent in preparing the Title Commitment, negotiating the coverage under the policy, and searching the Property's title; *see* Nigro Dep. at 11–12, 20–21; *see also* Knapp Cert., Exh. C; and (3) acted as the closing agent at settlement, whose wrongful conduct Title USA insured against in the Closing Protection Letter. *See* Adler Cert., Exh. U.

 After peeling away the layers of Nigro's numerous and often conflicting duties in the Home Federal transaction, *see In re Opinion 682,* 147 N.J. at 371, 687 A.2d 1000; *see also Baldasarre v. Butler,* 132 N.J. at 290–91, 625 A.2d 458 (discussing conflicts of interest arising out multiple representations of parties to a real estate closing), I conclude that the undisputed facts in the summary judgment record establish that Title USA voluntarily assumed a duty independent of its obligations in the title policy to assure Home Federal that its mortgage was a first priority lien. It is well settled in New Jersey that knowledge obtained by "an agent is imputed to the principal when it is received by the agent while acting within the course and scope of his employment, and when it is in reference to matters over which the agent's authority extends." *Benjamin v. Corcoran,* 268 N.J.Super. 517, 529, 634 A.2d 108 (1993) (quoting *Anderson v. Walthal,* 468 So.2d 291, 294 (Fla.Dist.Ct.App.1985); *see also Handleman v. Cox,* 39 N.J. 95, 104,

187 A.2d 708 (1963) (holding that "it is well settled that a principal is charged with the knowledge of his agent or servant respecting matters lying within the scope of the duties, activities, and responsibilities entrusted to him by the principal") (citations omitted). The agency agreement between Title USA and Eastern authorized Eastern to "search ... all relevant public records. .. relating to deeds, mortgages, taxes, assessments [and other instruments of record.]" *See* Knapp Cert., Exh. C (Agency Agreement, ¶ 4(a)(1)). Thus, Eastern clearly had the authority to perform title searches on behalf of Title USA.

On August 18, 1988, Title USA sent Nationwide Capital, acting on behalf of Home Federal, a closing protection letter, stating:

We are pleased to offer you ... protection as set out below in connection with closing of your real estate purchase and loans by our issuing agent or approved attorney: Eastern Developers Abstract ... [Title USA] hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by our Issuing Agent ... when such loss arises out of[ ] ... [f]ailure of our Issuing Agent ... to comply with your written closing instructions to the extent that they relate to ... the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status of title or line [sic]. . . .

*See* Adler Cert., Exh. U.

On August 29, 1988, Home Federal delivered to Winfree, acting on behalf of Eastern, a copy of its written closing instructions. *See* Adler Cert., Exh. L. The closing instructions specifically instructed the closing agents, Nigro and Winfree, acting on behalf of Eastern, *see* Nigro Dep. at 66, 107, that the closing should not proceed and the loan moneys should not be disbursed unless "Title USA can affirmatively

insure Home Federal ... that [its] Mortgage constitutes a valid first lien against the Property." *See* Adler Cert., Exh. L.

Much of the analysis regarding whether or not Title USA assumed and owed an extra-policy duty of care to Home Federal depends on the agency relationship between Nigro's company, Eastern, and Title USA. First, because Nigro was acting as the closing agent on behalf of Title USA, within the scope of his authority, his knowledge of the contents of Home Federal's closing instructions was imputed to Title USA. *Handleman,* 39 N.J. at 104, 187 A.2d 708.

In addition, in its closing protection letter, Title USA informed Home Federal that Eastern possessed the authority necessary to close the transaction on Title USA's behalf. *See* Adler Cert., Exh. U. Even if one could reasonably argue, that Eastern did not possess "actual authority" to close the transaction, on behalf Title USA, and consistent with Home Federal's closing instructions, *see United States v. Martinez,* 613 F.2d 473, 481 (3d Cir.1980) (defining "actual authority" as "the authority that the principal expressly or implicitly gave the agent"), it cannot be reasonably disputed that Title USA's closing protection letter conveyed to Home Federal that Eastern possessed "apparent authority" to do so. *See Martinez,* 613 F.2d. at 481 ("Apparent authority is power to bind the principal which the principal has not actually granted but which he leads persons with whom his agent deals to believe that he has granted."); *see also Mann v. Interstate Fire & Casualty,* 307 N.J.Super. 587, 595–96, 705 A.2d 360 (App. Div.1998) (stating that "apparent authority arises when a principal acts in such a manner as to convey the impression to a third party that the agent has certain power which he may or [may] not possess") (internal alterations, quotations and citations omitted).

Furthermore, by informing Home Federal that Eastern would close the transaction in accordance with Home Federal's closing instructions as they "relate[d] to

... the status of title [and the] ... enforceability and priority of the lien[,]" *see* Adler Cert., Exh. U, Title USA invited Home Federal to rely upon Eastern's authority to act in Title USA's stead. *See Mann,* 307 N.J.Super. at 597, 705 A.2d 360 (citing *Sears Mortgage Corp. v. Rose,* 134 N.J. 326, 338, 634 A.2d 74 (1993)).

Thus, when Nigro chose to close the transaction, as an employee for Eastern and as agent for Title USA, based on the knowledge he had obtained in searching title, pursuant to Eastern's agency agreement with Title USA, in preparing the Title Commitment, and knowing of Home Federal's condition that it be assured that its mortgage was "in fact" in first lien position, *see* Adler Cert., Exh. L, Title USA assumed the duty, independent of the terms of the title insurance policy, to assure Home Federal that its mortgage was "in fact" in first lien priority. Simply put, in closing the transaction on Home Federal's terms, Title USA "engage[d] in affirmative conduct to assume a duty voluntarily on behalf of [Home Federal]," *Stewart Title,* at 386 (citing *Walker Rogge,* 116 N.J. at 541, 562 A.2d 208), namely, the duty to assure Home Federal that its mortgage was "in fact" in first lien priority. *See* Adler Cert., Exh. L; *see also Mann,* 307 N.J.Super. at 597, 705 A.2d 360 (finding apparent authority and imposing liability on principal for negligent acts of agent) (citing *Sears Mortgage Corp.,* 134 N.J. at 346, 634 A.2d 74).

Moreover, Title USA's duty did not arise out of the terms of its closing protection letter. The obligations arising out of that document terminated by their own terms on August 29, 1989, "twelve months from the date of ... closing." *See* Adler Cert., Exh. U. Rather, Title USA's duty to assure that Home Federal's mortgage was in fact in a first lien position arises out of Home Federal's written closing instructions, and the fact that Title USA represented to Home Federal that Eastern was authorized to act as Title USA's agent at closing, specifically as to the execution of

Home Federal's "written closing instructions[.]" *See id.* When Nigro closed the transaction and disbursed the funds, Title USA engaged in the affirmative conduct required by *Walker Rogge,* 116 N.J. at 541, 562 A.2d 208.

In addition, although NTI correctly points out that Eastern was not authorized to perform title searches for the benefit of insureds, *see* NTI Brief at 18–19, Knapp Cert., Exh. C, the issue is not whether Eastern or Title USA contracted to provide Home Federal with an abstract of title. They did not. The issue is whether Title USA, through its closing agent, Eastern, assumed a duty to assure Home Federal that no other reasonably discoverable interest impaired its first lien priority. In its reply brief, NTI contends that:

> Plaintiff fails to explain ... how Title USA or Eastern breached any duty as a closing agent by conducting an incomplete title search. These are two separate functions and obligations. According to plaintiff, a party assuming one duty becomes liable for other unrelated duties it has never assumed. This was not the intention of the *Walker Rogge* holding.

*See* NTI Reply Brief at 5. NTI is laboring to create a distinction where none exists. In its closing instructions, Home Federal asked for assurances from Title USA, in addition to those provided by Nigro's opinion letter and Title USA's Title Commitment, that its mortgage was "in fact" a first priority lien. *See* Adler Cert., Exh. L, ¶ 4. In paragraph 4 of the closing instructions, Home Federal instructed Eastern to close the transaction, only when "Title USA can affirmatively insure Home Federal as of the date and time of recordation of the Mortgage that such Mortgage constitutes a valid first lien against the property." *Id.*

This request for additional assurances is separate from Title USA's obligations under the Title Commitment and policy. In paragraph 2 of the closing instructions, Home Federal discussed Title USA's obligations under the Title Commitment and

policy. *See id.,* ¶ 2, 562 A.2d 208. Home Federal states that it previously received the "marked-up" Title Commitment, and that it expected Title USA to issue a title insurance policy insuring Home Federal "as first lienholder on the Property encumbered by the Mortgage ... and subject only to those exception [listed in the Title Commitment]." *Id.* Paragraph 2 makes clear that Home Federal understood that its position as first lienholder was to be insured by Title USA under the terms of the policy.

Paragraph 4, however, goes beyond restating the coverage of the Title Commitment and policy, as in paragraph 2. Paragraph 4 directs Nigro to complete the transaction, *i.e.,* record the documents, "when and only when" certain conditions are met. *Id.* (emphasis omitted). First, the borrower, Atrium II, must have "fee title of record[.]" Second, the title insurance policy must issue containing the endorsements, and subject only to the exceptions, set forth in the Title Commitment. Finally, Nigro was instructed to close the transaction only if Title USA could "affirmatively insure" that the "Mortgage constitute[d], in fact, a first lien of record against the Property ..." *Id.*

Thus, contrary to NTI's contention, the scope of the duty Title USA assumed is not defined by labeling it the "duty to search title" or the "duty of a closing agent." *See* NTI Reply Brief at 5. The holding of *Walker Rogge* dictates that the scope of the title company's extra-policy obligation is defined by the "duties voluntarily assumed by the insurer in addition to the mere contract to insure title." *Walker Rogge,* 116 N.J. at 541, 562 A.2d 208 (citation omitted). Here, Home Federal requested additional assurances prior to closing; in closing the transaction, Nigro, acting with actual or apparent authority from Title USA, provided those additional assurances to Home Federal.

■ Furthermore, although it is undisputed that Eastern was not Title USA's employee, *see* Adler Cert. (NTI), Exh. I

(Letter ti Title USA from Nigro (dated Sept. 11, 1988)); *see also* Knapp Cert., Exh. C, the New Jersey Supreme Court's opinion in *Baldasarre v. Butler*, 132 N.J. 278, 625 A.2d 458 (1993), does not require a different conclusion. In *Baldasarre*, the New Jersey Supreme Court discussed the distinction between employee-agents and independent contractor-agents, stating that "the principal generally is not vicariously liable for the torts of the independent contractor if the principal did not direct or participate in them." *American Telephone and Telegraph Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1435 (3d Cir.1994) ("*AT & T*") (citing *Baldasarre*, 132 N.J. at 291, 625 A.2d 458) (alteration omitted). The Third Circuit in *AT & T*, however, noted that *Baldasarre* cannot "be read to hold that independent contractors may never bind their principals for torts ..." *AT & T*, 42 F.3d at 1436 n. 17 (citing *Sears Mortgage Corp.*, 134 N.J. at 346–47, 634 A.2d 74).

▮ In *Sears Mortgage Corp.*, a case antedating *Baldasarre*, the New Jersey Supreme Court held that a title insurance company was liable for the intentional wrongful acts "committed by its designated closing attorney even though the attorney was retained to represent the purchaser[.]" *Mann*, 307 N.J.Super. at 597, 705 A.2d 360 (construing *Sears Mortgage Corp.*, 134 N.J. at 346, 634 A.2d 74). Relying on *Sears Mortgage Corp.*, in *Mann*, the Appellate Division extended this holding to cover the negligent acts of an independent contractor-agent, where the agent had apparent authority to act on behalf of the principal. *Mann*, 307 N.J.Super. at 597, 705 A.2d 360. Thus, given that the closing protection letter clearly conveyed to Home Federal that Eastern had at least apparent authority to close the transaction in accordance with Home Federal's written instructions, Eastern's status as an independent contractor-agent does not prevent this Court from concluding that Title USA voluntarily assumed an extra-policy duty of care.

Finally, numerous other facts in the summary judgment record, found to be relevant in *Walker Rogge*, 116 N.J. at 541, 562 A.2d 208, are present and undisputed in this case. First, as in *Walker Rogge*, Eastern had voluminous files related to the Horizon Corporate Center, in general, and the Property at issue, in particular. *See* Nigro Dep. at 80. In addition, Title USA and Eastern had insured numerous parcels within the Horizon Corporate Center, and were familiar with the complicated state of title. *See id.* at 20–21, 79–81. Title USA's issuing agent "supervised the closing," at which time Nigro, acting in his capacity as borrower's attorney, delivered to Home Federal a letter opining as to Home Federal's lien priority based on a search performed by Title USA's agent, Eastern, in connection with preparing the Title Commitment. *See id.* at 117–18; *see also* Knapp Cert., Exh. C.

▮ Therefore, based on the undisputed facts in the summary judgment record, I conclude that Title USA voluntarily assumed a duty to assure Home Federal that there were no other instruments, reasonably discoverable, covering the Property that may adversely have affected Home Federal's lien priority. Consequently, when Title USA failed to inform Home Federal of the existence of Fidelity's second mortgage, Title USA breached this duty of care.

The fact that the Third Circuit ultimately determined that Fidelity's second mortgage was equitably subrogated to Home Federal's mortgage does not alter the fact that Title USA breached its duty of care. Title USA's duty was not to give Home Federal assurances that there were no defects in title, or to assure that there would be no challenges to Home Federal's lien priority. Rather, Title USA's duty was to assure Home Federal that it had disclosed all reasonably discoverable instruments covering the property.

Fidelity's second mortgage was undisputedly discoverable through the exercise of reasonable diligence. Nigro admitted

that copies of documents related to Fidelity's second mortgage should have been contained in Eastern's files, as it was required to maintain under the terms of its agency agreement with Title USA. *See* Nigro Dep. at 78–83; *see also* Knapp Cert., Exh. C. In addition, the title search performed by MSM Title Agency, Inc., on February 25, 1991, demonstrated that Fidelity's second mortgage could have been discovered if the record had been searched. *See* Adler Cert., Exh. F.

Therefore, I conclude that the undisputed facts in the summary judgment record establish that Title USA owed Home Federal a duty of care, independent of the terms of the title policy, that Title USA breached that duty, and for the reasons set forth in § III.A.3 *surpa*, that Title USA's breach of its duty proximately caused Home Federal injury.[14] Accordingly, I shall deny NTI's cross-motion for summary judgment, and grant RTC Mortgage Trust's motion for partial summary judgment on the issue of liability on its claim for negligent title search against NTI.

### c. *RTC Mortgage Trust's Claim for Negligent Hiring*

In opposition to NTI's cross-motion for summary judgment as to all of RTC Mortgage Trust's claims, RTC Mortgage Trust contends that the Amended Complaint sets forth a cause of action for negligent hiring. *See* Pl. Brief (NTI) at 13. Specifically, RTC Mortgage Trust contends that Title

USA was "negligent in supervising Nigro and in allowing Nigro to act as its agent at the Atrium II closing after underwriting counsel had asked that Nigro be terminated." *Id.* RTC Mortgage Trust further contends that "a question of fact exists as to whether [Title USA] was directly (and not vicariously) negligent. . . ." *Id.*

In its cross-moving papers, NTI does not address RTC Mortgage Trust's claim for negligent hiring. *See* NTI Brief and NTI Reply Brief. Thus, because, in cross-moving for summary judgment, NTI has not supported its motion as to this claim, and because RTC Mortgage Trust admits that a genuine issue of material fact exists about its own claim against NTI, I shall deny NTI's motion insofar as it seeks summary judgment on RTC Mortgage Trust's claim for negligent hiring.

### d. *Statute of Limitations*

NTI next contends that it is entitled to summary judgment on all of RTC Mortgage Trust's claims because RTC Mortgage Trust's complaint was filed after the expiration of the applicable six year statute limitations, specifically, N.J. Stat. Ann. § 2A:14–1.[15] *See* NTI Brief at 24–30. All of Plaintiff's claims, not just those asserted against NTI, are governed by the six year limitations period of N.J. Stat. Ann. § 2A:14–1. In answering the Amended Complaint, both Defendants raised the affirmative defense of the statute of limita-

---

14. NTI contends that RTC Mortgage Trust has failed to establish that Home Federal was damaged by Title USA's breach of its duty of care because Home Federal was free to petition the bankruptcy court to order the trustee of the debtor, Atrium II, to sell the Property at auction, holding the proceeds in escrow until conclusion of the title priority litigation. *See* NTI Brief at 21. Thus, NTI contends that, in failing to make such a request, any injury to Home Federal based on the time value of the foreclosure proceeds, was self inflicted. *See id.; see also* § III.A.3 *supra*. NTI's contention, however, goes to the issues of the amount of Home Federal's damages, and whether it had a duty to mitigate, not to the issue of the existence of an injury proximately caused by Title USA's breach.

15. Section 2A:14–1 provides:

> Every action at law for trespass to real property, for any tortious injury to real or personal property, for taking, detaining, or converting personal property, for replevin of goods or chattels, for any tortious injury to the rights of another not stated in sections 2A:14–2 and 2A:14–3 of this Title, or for recovery upon a contractual claim or liability, express or implied, not under seal, or upon an account other than one which concerns the trade or merchandise between merchant and merchant, their factors, agents and servants, shall be commenced within 6 years next after the cause of any such action shall have accrued.

*See* N.J. Stat. Ann. § 2A:14–1 (West 1998).

tions. *See* Caine, DiPasqua's Answer to Amended Compl. (filed July 7, 1997); NTI's Answer to Amended Compl. (file Mar. 14, 1997); Nigro's Answer to Amended Compl. (filed Oct. 6, 1997). NTI contends that Home Federal knew or should have known of Fidelity's second mortgage no later than October, 1989, rendering the filing of its original complaint on November 4, 1996, untimely.

In addition, each Defendant has asserted the affirmative defense of the statute of limitations in their respective answers. *See* Caine, DiPasqua's Answer to Amended Compl. (filed July 7, 1997); NTI's Answer to Amended Compl. (filed Mar. 14, 1997); Nigro's Answer to Amended Compl. (filed Oct. 6, 1997). After reviewing the evidence in the summary judgment record, I conclude that disputed issues of fact preclude this Court from resolving the question of whether Home Federal knew or should have known of Fidelity's second mortgage in October, 1989.

 Relying on *Sullivan v. Stout,* 120 N.J.L. 304, 199 A. 1 (E & A 1938), NTI first contends that the statute of limitations began to run on Plaintiff's claim for negligent title search from the date that Home Federal was given additional assurances of its first lien priority position, here, August 29, 1988. *Id.* at 306, 199 A. 1 (stating that "the rule has been declared to be that the statute of limitations begins to run from the time of the occurrence of the breach of duty, and not from the time of discovery ...."). NTI's reliance on *Sullivan* is misplaced because *Sullivan* involved a claim for legal malpractice arising out the attorney's erroneous certification of title. *See id.* In *Grunwald v. Bronkesh,* 131 N.J. 483, 621 A.2d 459 (1993), a case of much more recent vintage, the New Jersey Supreme held that the discovery rule applies to claims for legal malpractice. *See id.* at 493–94, 621 A.2d 459. In *Grunwald,* the New Jersey Supreme Court held:

> The discovery rule focuses on an injured party's knowledge concerning the origin and existence of his injuries as related to the conduct of another person. Such

knowledge involves two key elements, injury and fault. The limitations period begins to run when a plaintiff knows or should know the facts underlying those elements, not necessarily when a plaintiff learns the legal effect of those facts ... The discovery rule has been applied previously when the alleged injury was not readily ascertainable.

*Id.* at 493, 621 A.2d 459. "The 'discovery rule' is an equitable principle by which the accrual of a cause of action is delayed until the injured party discovers, or by the exercise of reasonable diligence and intelligence should have discovered, that he may have a basis for an actionable claim." *Staub v. Eastman Kodak Co.,* 320 N.J.Super. 34, 42–43, 726 A.2d 955 (App.Div.1999) (citing *Vispisiano v. Ashland Chemical Co.,* 107 N.J. 416, 419, 527 A.2d 66 (1987)) (additional citations, internal quotations and alterations omitted). Thus, in analogizing RTC Mortgage Trust's claim for negligent title search to the facts of *Sullivan,* in light of *Grunwald,* the statute of limitations did not begin to run on August 29, 1988, but rather, at the time Home Federal obtained facts sufficient that it knew, or through the exercise of reasonable diligence, should have known of the existence of Fidelity's second mortgage.

Recognizing in the alternative, the applicability of the discovery rule, NTI contends that Home Federal received notice of the existence of Fidelity's second mortgage through the pleadings filed in a 1989 mortgage foreclosure action in which Home Federal was named as a defendant. *See* Knapp Cert., Exh. N (Amended Complaint in *AEW # 9 Corp., et al. v. Mount Laurel Assocs., et al.,* Civil Action No. F–2445–89 (N.J.Sup.Ct., Chan.Div. Jul. 28, 1989)) (hereinafter, the "AEW foreclosure action"). The mortgage foreclosure action involved a number of parcels of land located in Horizon Corporate Center, and owned by MLA. The foreclosing mortgagees, AEW # 9 Corporation and AEW # 10 Corporation, named both Fidelity and Home Federal as defendants, as well as

MLA, Diemer and numerous other entities who had interests in the properties at issue. *See id.*

In the AEW foreclosure action, paragraph 19 of the Amended Complaint referenced Fidelity's $9.7 million mortgage loan and the property which served as the primary collateral for that loan. *See id.*, ¶ 19. Paragraphs 76–78 of AEW's Amended Complaint referenced Home Federal's $13.5 million mortgage on the Property at issue in this case. *See id.* Neither the Amended Complaint, nor the mortgage documents attached to the Amended Complaint as exhibits, disclosed the existence of Fidelity's cross-collateral, second mortgage, which is the centerpiece of this litigation. *See id.*

On October 16, 1989, Home Federal answered AEW's Amended Complaint. *See* Knapp Cert., Exh. O (Home Federal's Answer (dated Oct. 16, 1989)). Previously, on May 31, 1989, in its answer and counterclaims to the original complaint in the AEW foreclosure action, Fidelity alleged that it "[held] mortgages on additional parcels which are adjacent to or part of the same tax lots or within the same development as the premises subject to [AEW's] mortgage." *See* Knapp. Cert., Exh. R (Fidelity's Answer and Counterclaim, ¶ 10 at 15). Fidelity's answer specifically referenced parcels 15, 16 and 27, located in the Horizon Corporate Center. *See id.* The Property at issue in this case is commonly referred to as Parcel 2. *See* Adler Cert., Exh. O (Home Federal Mortgage and Security Agreement).

Based on these facts, NTI contends that "[Home Federal] acquired knowledge of the Fidelity ... [second] mortgage as a lien on the [Property; and] [t]herefore, as of October of 1989, [Home Federal] knew, or had sufficient facts to have discovered that the mortgage constituted a lien on the Atrium II property." *See* NTI Brief at 26–27. Consequently, NTI contends that when RTC Mortgage Trust filed its original Complaint in this case on November 4, 1996, its claims for negligence were time barred. *See id.*

"[U]nder New Jersey law, questions of fact as to when a cause of action is deemed to accrue for purposes of applying a statute of limitations are ordinarily resolved by a judge and not a jury." *Berlen v. Consolidated Rail Corp.*, 291 N.J.Super. 542, 555, 677 A.2d 1150 (App.Div.1996) (citing *Lopez*, 62 N.J. at 272, 300 A.2d 563). In *Lopez v. Swyer*, 62 N.J. 267, 300 A.2d 563 (1973), the New Jersey Supreme Court stated:

> [S]tatutes of limitations are statutes of repose and the principal consideration underlying their enactment is one of fairness to the defendant. So in each case the claims ... claims of the opposing parties must be identified, evaluated and weighed. Where, as is often the case, they cannot be wholly reconciled, a just accommodation must be reached. We think this can better be done by a judge than by a jury.... [T]he question as to the application of the statute of limitations is ordinarily a legal matter and as such is traditionally within the province of the court.

*Id.* at 274, 300 A.2d 563.

In *Goodman v. Mead Johnson & Co.*, 534 F.2d 566 (3d Cir.1976), the Third Circuit, in analyzing and applying *Lopez v. Swyer*, held that the Seventh Amendment requires that a jury, and not a District Court, resolve disputed issues of fact regarding the accrual of a cause of action under New Jersey's discovery rule. *See id.* at 571–73 (applying *Byrd v. Blue Ridge Rural Elec. Co-op., Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958)). The Third Circuit stated that "the federal policy favoring jury decisions of disputed fact questions must prevail over the state practice of allocating to the court the decision as to the time of discovery of the cause of action." *Id.* at 573. Thus, although this Court's jurisdiction is based upon the diversity of citizenship, and state law generally governs issues of accrual of state causes of action, *cf. Guaranty Trust Co. v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *see Gasperini v. Center*

*for Humanities, Inc.,* 518 U.S. 415, 427 n. 7, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (noting "that state law ... determines when a diversity action commences for the purposes of tolling the state statute of limitations") (citations omitted), the Court must deny a motion for summary judgment if disputed issues of fact exist surrounding the "discovery" of an injury. *See Goodman,* 534 F.2d at 573.

The facts to which NTI refers in support of its statute of limitations argument are not disputed by RTC Mortgage Trust. *See* Pl. Brief (LTIC) at 13–17. NTI's recitation of the facts, however, is incomplete. At the same time that Home Federal received the pleadings in the AEW foreclosure action, it was also receiving monthly letters from Eastern, signed by Linda Winfree, stating that "Home Federal is in first lien position." *See* Adler Cert. (LTIC), Exh. K (Letter to Home Federal from Eastern (dated July 7, 1989)). These letters also stated that only a "bringdown" search had been performed, and not a full scale search of the Property's title. *See id.*

In addition to the letters from Eastern, RTC Mortgage Trust also submitted the affidavit of Susan E. Reid, Esq., Home Federal's staff counsel during the AEW foreclosure action. *See* Certification of Susan E. Reid, Esq. (filed Dec. 14, 1998), ¶ 1. Ms. Reid testified:

> At no time during the AEW foreclosure did anyone advise me or did I become aware that Fidelity ... had a mortgage on the Atrium II property which predated HomeFed's mortgage [ ]or that Fidelity ... possessed any mortgage on the Atrium II property. If I had known that, I would have immediately investigated the situation and taken steps to address the problem. It was not until after HomeFed commenced its foreclosure against Atrium II in late 1990 that HomeFed learned that there was a prior mortgage that had not been disclosed to

HomeFed at the time HomeFed extended the mortgage loan to Atrium II. *Id.,* ¶ 3.

After reviewing the evidence in the summary judgment record, I conclude that a genuine issue of material fact exists as to whether Home Federal knew or should have known of Fidelity's second mortgage as early as October, 1989. The AEW foreclosure action undoubtedly alerted Home Federal to AEW's challenge to Home Federal's lien position. The pleadings, however, did not state that the Property served as cross-collateral for Fidelity's $9.7 million dollar mortgage. In addition, Fidelity's $9.7 million mortgage and the Home Federal mortgage covering the Atrium II property were referenced in separate counts of AEW's amended complaint. *See* Knapp Cert., Exh. N. These facts coupled with Eastern's letters to Home Federal, stating that Home Federal had a first priority lien, and the testimony of Ms. Reid, that nothing about the AEW action alerted her to the existence of Fidelity's second mortgage, demonstrates that the facts are clearly in dispute as to whether the AEW foreclosure action provided Home Federal with the notice necessary under New Jersey's discovery rule.

Accordingly, I shall deny NTI's motion for summary judgment, and, as required by *Goodman,* I shall empanel a jury to resolve this issue of disputed fact. *Goodman,* 534 F.2d at 571–73. Because all of the Defendants have asserted the affirmative defense of the statute of limitations, should a jury ultimately determine that Home Federal knew or should have known of the existence of Fidelity's second mortgage no later than October, 1989, under *Lopez v. Swyer,* it follows that RTC Mortgage Trust's claims will be barred by the statute of limitations.

e. *NTI's Request that this Court "Reexamine" its Holding in RTC II*

In *RTC II,* I held that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"),

Pub.L. No. 101–73, 103 Stat. 183, preempted New Jersey's law prohibiting the assignment of pre-judgment tort claims. *See RTC II*, 16 F.Supp.2d at 565–69. In support of its cross-motion for summary judgment, NTI "requests that this Court reexamine its ruling on the preemption issue in light of *Integrated Solutions v. Service Support Specialties*, 124 F.3d 487 (3d Cir. 1997)." *See* NTI's Brief at 27. NTI contends that the Third Circuit's opinion in *Integrated Solutions* suggests that this Court erred in *RTC II*. NTI is wrong.

In *Integrated Solutions*, the Third Circuit held that the Bankruptcy Code did not preempt New Jersey's prohibition against the assignment of prejudgment tort claims, such that the putative assignee lacked standing to sue. *Integrated Solutions*, 124 F.3d at 495–96. Contrary to NTI's contention, other than the fact that both cases involved New Jersey's prohibition on the assignment of prejudgment tort claims, the Third Circuit's discussion in *Integrated Solutions* does not suggest that my Opinion in *RTC II* must be reconsidered.

In *Integrated Solutions*, the Third Circuit observed that the Bankruptcy Code is highly dependent on the application of state law, particularly with regard to state property law. *See id.* The Third Circuit stated:

> Our task [in considering the preemptive effect of the Bankruptcy Code] is to ascertain and give effect to congressional intent. However, we must approach that task with the realization that the Bankruptcy Code was written with the expectation that it would be applied in the context of state law and that federal courts are not licensed to disregard interests created by state law when that course is not clearly required to effectuate federal interests.

*Id.* at 492 (quoting *In re Roach*, 824 F.2d 1370, 1373 (3d Cir.1987)). "Thus, ... [the Third Circuit] adopted a restrained approach to concluding that Congress has intended to preempt state law in the bankruptcy context." *Id.* (footnote omitted).

The state law interests discussed in *Integrated Solutions* are absent when considering the preemptive effect of FIRREA. FIRREA "was a vital part of the federal government's response" to a nationwide crisis in the savings and loan industry. *RTC II*, 16 F.Supp.2d at 566–67. As I observed in *RTC II*, application of the New Jersey law prohibiting assignment of prejudgment tort claims would "stand[ ] as a substantial obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting FIRREA. *Id.* at 567. In *RTC II*, I stated:

> New Jersey's rule would meaningfully frustrate, among other powers, the RTC's broad powers to transfer assets, dispose of real or personal property, liquidate failed depository institutions and realize upon the assets of those institutions, organize new or bridge banks, and otherwise exercise the usual incidents of ownership of property necessary to the RTC's mission under FIRREA. If the New Jersey rule against the assignability of tort claims prior to judgment were to survive in the face of this broad grant of power to the RTC, then the RTC would be forced to bring all tort claims under New Jersey law and could not then dispose of any other assets out of with which the tort claims arise. Moreover, survival of the New Jersey rule in the face of FIRREA would prevent the RTC from efficiently transferring large numbers of mortgages and loans at a time because it would have to determine the assignability of certain mortgages and loans on a case by case basis to determine whether there may be a tort claim arising out of the transaction.

*Id.* at 567 (citations omitted). Without restating all of my Opinion in *RTC II*, the significant federal interest in uniformity, clearly implicated by the enactment of FIRREA, is absent with regard to the Bankruptcy Code, which focuses on individual debtors, rather than a nationwide financial crisis. *RTC II*, 16 F.Supp.2d at 567–68.

As the Third Circuit observed in *Integrated Solutions*, "[p]re-emption must be either explicit, or compelled due to an unavoidable conflict between the state law and the federal law." *Integrated Solutions*, 124 F.3d at 491. Thus, as this Court stated in *RTC II*, a determination of whether a federal statute preempts state law requires a qualitative analysis of the two laws, the policies supporting the federal statute, and the areas of potential conflict. NTI's conclusory statement that, because the bankruptcy trustee and the Resolution Trust Corporation share broad powers, the two statutes should be construed the same for purposes of preemption is specious. I see no need to re-examine my holding in *RTC II*.

NTI also contends that, even if FIRREA préempts New Jersey law prohibiting the assignment of pre-judgment tort claims, FIRREA preemption only applies to the Resolution Trust Corporation's assignment of Home Federal's tort claims to Bank of America, and not to Bank of America's re-assignment of the tort claims to Plaintiff. *See* NTI Brief at 30. In *RTC II*, I discussed the nature and structure of the assignment transaction between the Resolution Trust Corporation and Plaintiff. *See RTC II*, 16 F.Supp.2d at 559–61. Contrary to NTI's overly formalistic view, the Bank of America assignment was part of, not separate from, the transaction between the Resolution Trust Corporation and Plaintiff. In *RTC II*, I found:

> The purchase by [Plaintiff] of the Atrium II mortgage and loan, among other assets, was funded in part by the issuance of bonds by [Plaintiff]. The mortgages and loans purchased by [Plaintiff] were collateral for the bonds and Bank of America ... acted as bond trustee. Thus, simultaneously with the execution of the Assignment from the [Resolution Trust Corporation] to [Plaintiff], the [Resolution Trust Corporation], as a matter of convenience and on behalf of RTC Mortgage Trust, assigned the relevant mortgages and loans to Bank of America. On January 29, 1996, following the pay-off of the bonds which par-

tially funded [Plaintiff's] purchase of the mortgages and loans from the [Resolution Trust Corporation], Bank of America and [Plaintiff] assigned the collateral which had been pledged in connection with the issuance of the bonds. This was accomplished by Bank of America's assignment of all of its interest in the Atrium II mortgage and loan, among other things, to RTC Mortgage Trust.

*RTC II*, 16 F.Supp.2d at 560 (citations omitted). Clearly, the assignment of the HomeFed assets to Bank of America was for the purpose of pledging collateral to secure Plaintiff's bonds. As courts often look past the formalities of a lease agreement, which in substance was intended as security, *see BJL Leasing Corp. v. Whittington, Singer, Davis & Co., Inc.*, 204 N.J.Super. 314, 320, 498 A.2d 1262 (1985), so too here, the assignment transaction between Bank of America and RTC Mortgage Trust was functionally the release of collateral after the repayment of a loan. NTI's contentions to the contrary, while creative, are unpersuasive.

#### f. Counsel Fees

NTI contends that it is entitled to summary judgment on RTC Mortgage Trust's claim for counsel fees. In opposition to NTI's cross-motion, RTC Mortgage Trust contends that it is entitled to have its counsel fees considered as an element of its damages, and that counsel fees in this action are authorized by New Jersey Court Rule 4:42–9(a)(6). *See* RTC Mortgage Trust's Brief (LTIC) at 34–36. I shall consider each of RTC Mortgage Trust's contentions separately.

New Jersey Court Rule 4:42–9(a)(6) provides, in relevant part, that "[n]o fee for legal services shall be allowed in the taxed costs or otherwise, except ... in an action upon a liability or indemnity policy of insurance, in favor of a successful claimant." *See* N.J. Ct. R. 4:42–9(a)(6). "The policy underlying Rule 4:42–9(a)(6) is to discourage groundless disclaimers and to provide more equitably to an insured the benefits

of the insurance contract without the necessity of obtaining a judicial determination that the insured, in fact, is entitled to protection." *Sears Mortgage Corp.*, 134 N.J. at 356, 634 A.2d 74 (citation and internal quotations omitted). "[T]he stated intention of this rule [is] to permit an award of counsel fees only where an insurer refused to indemnify or defend in respect of its insured's third party liability to another[.]" *See* Sylvia B. Pressler, *Rules Governing the Courts of the State of New Jersey*, § 4:42–9[2] at 1324 (1998 ed.) (citations omitted). Accordingly, the rule "should not be extended[ ] beyond its express terms . . ." *Id.*

■ In this case, NTI's predecessor, Title USA, did not refuse to defend Home Federal. On the contrary, as stated in detail in § III.B.2 *supra*, Title USA fulfilled all of its obligations under the title insurance policy. Therefore, I conclude that RTC Mortgage Trust cannot rely upon Rule 4:42–9(a)(6) as a basis for the recovery of attorneys' fees in this action.

The cases cited by RTC Mortgage Trust support this conclusion. Both *Enright v. Lubow*, 215 N.J.Super. 306, 521 A.2d 1300 (App.Div.1987), and *Summonte*, 180 N.J.Super. 605, 436 A.2d 110, were actions against insurers for failure to defend or indemnify based on their contractual obligations under the policies. RTC Mortgage Trust has cited no case, and the Court's research has uncovered no case, permitting the recovery of attorneys' fees for claims against an insurance company sounding in negligence, rather than contract.

Furthermore, to the extent that RTC Mortgage Trust seeks to have Home Federal's counsel fees, incurred in proceeding before the Bankruptcy Court, considered an element of its damages in its claim for negligence against NTI, RTC Mortgage Trust has cited to no authority supporting

such a position. "New Jersey has a strong policy disfavoring shifting of attorneys' fees." *North Bergen Rex Transport, Inc. v. Trailer Leasing Co.*, 158 N.J. 561, 569, 730 A.2d 843 (1999) (citing *McGuire v. City of Jersey City*, 125 N.J. 310, 326, 593 A.2d 309 (1991)). New Jersey "generally adhere[s] to the so-called 'American Rule,' meaning that the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *North Bergen Rex Transport*, 158 N.J. at 569, 730 A.2d 843 (citation and internal quotations omitted).

The authority RTC Mortgage Trust does cite stands for the proposition that an insured may recover attorneys' fees from an insurer when the insurer wrongfully refuses to defend the insured under the terms of the policy. *See* Pl. Brief (LTIC) at 34 (citing *Gerhardt v. Continental Ins. Cos.*, 48 N.J. 291, 300, 225 A.2d 328 (1966) (awarding counsel fees when insurer failed to defend insured under indemnity policy); *Frommeyer v. L & R Constr. Co.*, 261 F.2d 879, 881 (3d Cir.1958) (same)). This is nothing more than a restatement of Rule 4:42–9(a)(6). *See* N.J. Ct. R. 4:42–9(a)(6). Thus, I conclude that RTC Mortgage Trust has failed to demonstrate a legal basis entitling it to attorneys' fees as an element of damages in its claim for negligence against NTI, such that this Court should not apply New Jersey's "strong policy disfavoring shifting of attorneys' fees." *North Bergen Rex Transport*, 158 N.J. at 569, 730 A.2d 843. Accordingly, I shall grant NTI's motion for summary judgment on the issue of attorneys' fees.[16]

### C. *LTIC's Motion for Summary Judgment*

LTIC has moved for summary judgment on all claims asserted by RTC Mortgage Trust against it in Count II of the Amended Complaint, namely, breach of contract

---

**16.** This conclusion in no way affects RTC Mortgage Trust's ability to recover attorneys' fees on its claim for legal malpractice against the Lawyer Defendants. *See Bailey v. Pocaro & Pocaro,* 305 N.J.Super. 1, 701 A.2d 916 (App.Div.1997) (stating that "the award of attorneys' fees has become an element of damages in ... cause[s] of action for legal malpractice").

and negligent title search. I conclude that LTIC is entitled to a judgment as a matter of law.

First, unlike Title USA, who issued the closing protection letter, authorized Nigro to close the transaction, and accepted Home Federal's conditions contained in the closing instructions, *see* § III.B.2 *supra*, the summary judgment record contains no facts tending to suggest that Home Federal's injury "was the direct result of duties voluntarily assumed by [LTIC] in addition to the mere contract to [reinsure] title." *Walker Rogge*, 116 N.J. at 541, 562 A.2d 208 (citation omitted). Therefore, I conclude that LTIC's "liability is limited to the policy and that [LTIC] is not liable in tort for negligence in searching records." *Id.* at 535, 562 A.2d 208.

Second, as to RTC Mortgage Trust's claim for breach of contract, for the reasons set forth in § III.B.2 *supra*, because Title USA did not breach its obligations to Home Federal under the title insurance policy, LTIC, as reinsurer, could in no way have breached its obligations to Home Federal. Accordingly, because I have found that no genuine issue of material fact exists as to RTC Mortgage Trust's claims against LTIC, and because I conclude that LTIC is entitled to a judgment as a matter of law, I shall grant LTIC's motion for summary judgment on Count II of RTC Mortgage Trust's Amended Complaint.

## V. CONCLUSION

For the reasons set forth above, I shall grant RTC Mortgage Trust's motion for partial summary judgment on the issue of liability on its claim for legal malpractice against the Lawyer Defendants, Nigro and Caine, DiPasqua. I shall also grant Plaintiff's motion for partial summary judgment on the issue of liability on its claim for negligent title search against NTI. The entry of these partial summary judgments in favor of Plaintiff, however, is subject to a resolution of disputed issues of material fact by a jury, to determine whether these claims, as well as Plaintiff's claim for negligent hiring against NTI, are barred by the statute of limitations. In addition, I shall grant NTI's cross-motion for summary judgment on RTC Mortgage Trust's claims for breach of contract and the recovery of attorneys' fees. I shall, however, deny NTI's cross-motion for summary judgment insofar as it seeks summary judgment on RTC Mortgage Trust's claim for negligent hiring, subject to the resolution of disputed issues of material fact by a jury surrounding the statute of limitations defense. Furthermore, I shall grant Defendant, Fidelity National Title Insurance Company's motion for summary judgment on all claims asserted against it by Plaintiff. Finally, I shall grant LTIC's motion for summary judgment on all claims asserted against it by RTC Mortgage Trust. The Court shall enter an appropriate order.

Having resolved the parties' motions and cross-motions for summary judgment, the following issues remain to be resolved at trial: (1) whether Home Federal knew or should have known of Fidelity's second mortgage as early as October, 1989, such that the Lawyer Defendants and NTI are entitled to a judgment in their favor on the basis of the affirmative defense of the statute of limitations on RTC Mortgage Trust's claims for legal malpractice, negligent title search, and negligent hiring; (2) the measure of damages on RTC Mortgage Trust's claim for legal malpractice against Nigro and Caine, DiPasqua; (3) the measure of damages on RTC Mortgage Trust's claim for negligent title search against NTI; and (4) RTC Mortgage Trust's claim for negligent hiring against NTI.

## ORDER

This matter having come before the Court on the motions of Plaintiff, RTC Mortgage Trust 1994 N–1, for partial summary judgment, and on the motion of Defendant, Lawyers Title Insurance Corporation, for summary judgment, and on the cross-motion of Defendants, Fidelity Na-

tional Title Insurance Company and Nations Title Insurance of New York, for summary judgment, John A. Adler, Esq. of Hellring, Lindeman, Goldstein & Siegal, L.L.P., appearing on behalf of Plaintiff, RTC Mortgage Trust 1994 N–1, and Charles J. Vinicombe, Esq. of Drinker, Biddle & Reath, L.L.P., appearing on behalf of Defendant, Lawyers Title Insurance Corporation, and Josiah A. Knapp, Esq. of Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano, P.C., appearing on behalf of Defendants, Fidelity National Title Insurance Company and Nations Title Insurance Company, and John P. O'Toole, Esq., of Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P., appearing on behalf of Defendant, Caine, DiPasqua, Sloane & Raffaele, and Rocco M. Nigro, Esq. appearing *pro se;* and,

The Court having considered the submissions of the parties, for the reasons set forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 29th day of July, 1999, hereby ORDERED that:

(1) the motion of Plaintiff, RTC Mortgage Trust 1994 N–1, for partial summary on the issue of liability on its claims for legal malpractice, set forth in Counts IV and V of the Amended Complaint, against Defendants, Caine, DiPasqua, Sloane & Raffaele, and Rocco M. Nigro, is GRANTED, subject to the resolution of disputed issues of material fact by a jury surrounding the statute of limitations defense asserted by these Defendants;

(2) the motion of Plaintiff, RTC Mortgage Trust 1994 N–1, for partial summary on the issue of liability on its claims for breach of contract and negligence, set forth in Count I of the Amended Complaint, against Defendant, Fidelity National Title Insurance Company, is DENIED, and that the cross-motion of Defendant, Fidelity National Title Insurance Company, for summary judgment is GRANTED;

(3) the motion of Plaintiff, RTC Mortgage Trust 1994 N–1, for partial sum-

mary on the issue of liability on its claims for breach of contract and negligence, set forth in Count I of the Amended Complaint, against Defendant, Nations Title Insurance of New York, is GRANTED in part and DENIED part, and that the cross-motion of Defendant, Nations Title Insurance of New York, for summary judgment is GRANTED in part and DENIED in part;

(a) the cross-motion of Defendant, Nations Title Insurance of New York, for summary judgment on Plaintiff's claim for breach of contract is GRANTED;

(b) the cross-motion of Defendant, Nations Title Insurance of New York, for summary judgment on Plaintiff's claim for negligent title search, is DENIED, and Plaintiff's motion for partial summary judgment on the issue of liability on its claim for negligent title search is GRANTED subject to the resolution of disputed issues of material fact by a jury surrounding the statute of limitations defense asserted by Nations Title Insurance of New York;

(c) the cross-motion of Defendant, Nations Title Insurance of New York, for summary judgment on Plaintiff's claim for negligent hiring, is DENIED subject to the resolution of disputed issues of material fact by a jury surrounding the statute of limitations defense;

(d) the cross-motion of Defendant, Nations Title Insurance of New York, for summary judgment on Plaintiff's claim for attorneys' fees, is GRANTED; and

(4) the motion of Defendant, Lawyers Title Insurance Company, for summary judgment on Plaintiff's claims for breach of contract and negligence, set forth in Count II of the Amended Complaint, is GRANTED.